PATRICK McGOVERN and CHARLES L. PERRIN, Respondents, *v.*
THE CITY OF NEW YORK, Appellant.

First Department, July 14, 1922.

Municipal corporations — action against city of New York to recover
balance due on contract for constructing section of subway — first
cause of action for supporting certain stoops should have been dismissed
— contract provided for underpinning buildings at fixed price per lineal
foot of front wall and that contractors should protect surface and sub-
surface structures at their own expense — evidence — error to admit evi-
dence to show contractors expected supporting stoops would be classed
as underpinning and to permit testimony of experts that such work
was underpinning — contractors entitled to tunnel excavation price
for excavating exits from express tracks to local stations and ventilating
chamber over express tracks — evidence warranted direction of verdict
for contractors for extra work in connection with electrical conduits
made necessary by order of Public Service Commission — proper for
court to direct verdict for contractors for relaying gas pipes — court
properly directed verdict for contractors for extra work made necessary
because soft earth and mud were encountered where contractors had
reason to expect rock in view of acts of city — city should have known
true conditions — evidence — cost of construction through soft earth
and mud and cost of construction for same distance through rock satis-
factory basis of damages — action of court in directing verdict for
plaintiffs on seven items for extra work and submitting two items to
jury proper — extra work partly ordered by city and partly outside
contract — verdict of jury for plaintiffs on two items on conflicting
evidence should not be disturbed — claims of plaintiffs not forfeited
because of failure to present as required by article in contract — defend-
ant waived formal presentation.

In an action against the city of New York to recover the balance due under a
contract for the construction of a section of a subway underneath Lexington
avenue in said city, a cause of action for underpinning certain stoops, some of
which were appurtenant to dwellings the front walls of which were underpinned,
and some of which were appurtenant to dwellings no walls of which were under-
pinned, should have been dismissed, where it appears that the contract provided
for a fixed sum per lineal front foot of the buildings underpinned and that the
plaintiffs had already been paid on that basis for underpinning the front walls
of the buildings on premises abutting on the street; that the evidence indicates
that the stoops were for the most part encroachments on the street; that neither
the stoops nor the walls underneath them formed any support to the buildings;
that, with certain exceptions, the weight carried by the walls under the stoops
was not sufficient to exert any pressure on the subway structure when com-
pleted, to avoid which was the purpose of the specification in the contract
requiring the underpinning of adjacent buildings; that the work done in support-
ing the stoops was materially different from that done in underpinning the build-
ings; that, pursuant to the contract, the contractors in every instance of under-
pinning a building submitted to the section engineer for approval, in advance
of doing the work, a sketch showing their plan for such underpinning, but in

no instance was this done with respect to the work of supporting the stoops; and it further appears that the contract provided that the contractor should protect from injury all surface and subsurface structures and restore them if injured and that this work should all be at the expense of the contractor and should be included in the prices stipulated in the schedule for excavation.

It was prejudicial error, even if there had been a question of fact for the jury, for the court to permit the plaintiffs to show that in preparing their bid they considered the work of supporting the stoops as underpinning; that the proposal of another earlier bidder was prepared on the same theory, such bidder being advised by an engineer, who was then in the employ of the Public Service Commission but who was not in its employ when the bids upon which the contract was let were received, that the stoops would be included in the bid for underpinning; and that, after the plaintiffs' contract was made and they had made their claim that they were entitled to recover as for underpinning for the work done in supporting the stoops. the chief engineer. preliminary to inviting proposals on another section of the work, changed the phraseology of the specifications with respect to the underpinning so as to make it perfectly clear that payment for underpinning work would be limited to underpinning the front walls of the buildings.

However, since the contract plainly limited the right of recovery for underpinning to the lineal frontage of the main walls of the buildings underpinned, it was improper even for the court to receive the testimony of experts produced by the plaintiffs to the effect that the work performed in supporting the stoqps was underpinning.

Excavation for emergency passenger exits to local stations from the express tracks and for a ventilating chamber over the express tracks was all tunnel excavation within the fair meaning of the contract, and a classification by the engineer of a portion of the same as rock excavation for which the contractor was to receive a lower price was not conclusive; hence, the court properly directed a verdict for the plaintiffs on the second cause of action, which was for the difference between the price for the work at the tunnel excavation rate and the amount which had already been allowed, it appearing that there was no separate classification in the contract for this excavation and that the proof showed that the cost was greater than the cost of tunnelling for the express tracks.

The court properly directed a verdict for the plaintiffs on the third cause of action which was for extra work performed and materials furnished in constructing, removing, relocating and restoring certain ducts containing electrical wires which were located under the pavement and in supplying and drawing cables into and through them, for it appears that these duct lines might have been retained in their original places by making slight changes and in that case little additional excavation or new cable would have been required, but the Commission required most of the ducts to be placed outside the open cut excavation and under the sidewalks, which involved much extra excavation, relocating manholes and installing new cables; that the evidence is uncontroverted with respect to what was required to be done by the plaintiffs and the reasonable value thereof; that the work did not properly fall within the provisions of a section of the specifications providing for changes in electrical conduits made necessary by the construction of the subway, and that the prices allowed are not repugnant to the terms of the contract.

The court properly directed a verdict for the plaintiffs on the fourth cause of action which was for two items, gas pipes relaid because of interference with the subway structure or surface structures and gas pipes relaid because of interference with a split tile duct line, for it appears that, although the split tile

duct line was not ordered by the Commission, its laying was an economical arrangement and the cost thereof and of changing the location of the gas pipes incident thereto was less than it would have cost to remove certain underground cables for which it was provided; and the evidence is uncontroverted that the plaintiffs made no claims for gas pipes changed for their own convenience, and at the close of the evidence the defendant moved for a dismissal of the cause of action and the plaintiffs moved for the direction of a verdict and the court invited a suggestion as to whether there was any question for the jury but no claim was made by the defendant that there was any such question; it is now too late for the defendant to contend that it was for the jury to pass on the expert testimony.

It was proper also for the court to direct a verdict for the plaintiffs on the fifth cause of action for extra work not contemplated by the contract and made necessary because soft earth and mud were encountered for some distance in excavating where the plaintiffs expected to find rock, the evidence of the plaintiffs' damages being uncontroverted and of a satisfactory nature, being based on the actual cost of constructing the tunnel through the portion of the street in question and the actual cost of constructing the tunnel for the same distance at other points where the construction was through solid rock, it appearing also that the defendant should have anticipated the actual conditions but that it led the plaintiffs to believe by the drawings it furnished that solid rock only would be encountered.   The fact that the contract contains the usual provisions that the bidders must inspect the premises themselves is not objectionable to such recovery as the contract was let on a unit basis and for work under one of the principal thoroughfares of the city, and it was not expected that bidders should make and rely on their own borings, and it would have been impracticable for them so to do, for the street was left open for traffic until after the work of construction commenced.   Moreover, the claim comes within the provisions of an article in the contract entitled " Work not Susceptible of Classification."

The action of the court in directing a verdict for the plaintiffs on seven items of the sixth cause of action and in submitting two items to the jury was proper and the verdict of the jury for the plaintiffs on the two items should not be disturbed, it appearing that all the items were for extra work, some of which was specifically ordered by the city and the remainder was not contemplated by the contract, and that the question of the nature of the rock where the work was done was the only question for the jury in the two items submitted to them and that they found for the plaintiffs on conflicting evidence.

The claims of the plaintiffs were not forfeited because they were not presented to the chief engineer on or before the fifteenth day of the month following the accrual thereof as required by article 43 of the contract, as the claims were asserted in behalf of the plaintiffs from time to time and they were thoroughly understood by the chief engineer and he understood that the plaintiffs did not intend to waive them.   If said article 43 applies to such claims, the defendant should be deemed to have waived formal presentation thereof.

APPEAL by the defendant, The City of New York, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York on the 27th day of July, 1920, upon the verdict of a jury rendered in part by the direction of the court; also from an order entered in said clerk's office on the 16th day of April, 1920, directing interest to be added to the verdict, and also from an order entered in said clerk's office

on the 23d day of June, 1920, granting an additional allowance of $2,000 to the plaintiffs.

*John P. O'Brien, Corporation Counsel* [*Willard S. Allen*, of counsel; *John F. O'Brien* and *Charles C. Smith* with him on the brief], for the appellant.

*Thomas F. Conway* of counsel [*Joseph A. Kellogg* and *Thomas E. O'Brien* with him on the brief], for the respondents.

LAUGHLIN, J.:

This action was brought to recover a balance claimed to be owing under a contract in writing made between the plaintiff McGovern and the defendant by the Public Service Commission, First District, on the 13th day of February, 1912, for the construction of section 9, route 5, of the Lexington Avenue subway in the borough of Manhattan between a point fifty feet north of the center line of East Sixty-seventh street and a point seventy feet south of the center line of East Seventy-ninth street, and for damages for breaches thereof. The contract was duly assigned to the plaintiffs under the firm name of Patrick McGovern & Co. Proposals were not invited for the construction of the subway for a gross sum, but on a unit basis for the different classes of work and material, and the contract accordingly provided for payment for the work and labor performed and the materials furnished according to the unit basis of prices contained in the proposal of the bidder, and for work not coming within the specified classifications at cost plus ten per cent.

The avenue is seventy-five feet in width and the fee thereto was owned by the city, and the width of the carriageway between the curbs is thirty-seven and one-half feet leaving a sidewalk and areaways on each side of the width of eighteen feet nine inches. The plans provided for an open cut from the surface for the construction of two local tracks and for the construction of two express tracks in tunnels underneath the local tracks, and for local stations at Sixty-eighth and Seventy-seventh streets; and at those streets the surface of the street was to be excavated for the entire width of the avenue and for some distance beyond in the intersecting streets. The center line of the avenue was made the center line of the subway. From the intersecting streets at which stations were to be constructed the width of the cut became gradually narrower, and between the second and third blocks therefrom it attained the minimum width of thirty-three feet.

One of the units for which the bidders were invited to submit proposals was underpinning, and they were required to specify the amount per lineal front foot of building underpinned for which

they would do the work; and the blank in the specifications was
filled in in accordance with the bid at $82. The plaintiffs were
allowed on this basis for underpinning *the front walls* of buildings
on premises abutting on the street. They, however, claim to be
entitled to recover in addition thereto on the perimeter measure-
ment of certain stoops, some of which were appurtenant to dwellings
the front walls of which were underpinned, and some of which
were appurtenant to dwellings no wall of which was underpinned.
That claim was disallowed by the chief engineer representing the
defendant. The claim made by the plaintiffs for underpinning
which was so disallowed is with respect to sixty-seven stoops and
aggregates the sum of $148,153.50; and it constitutes the first
cause of action. On the issues arising with respect to that claim
the court, over the defendant's objections that the determination
of the engineer was conclusive and that the contract did not permit
the recovery for the work, and its exception, permitted the plain-
tiffs to present the testimony of experts to the effect that the
work performed in supporting the stoops was underpinning; and
also permitted the plaintiffs to show, over the city's objection
and exception that the evidence was incompetent, that in pre-
paring their proposal they considered that the work which they
might be required to do or which it might become necessary to
do in supporting the stoops was underpinning. They were also
permitted to show, over like objections and exception, that on
a prior advertisement in 1910 for proposals for this work the proposal
of another bidder of $150 per foot was prepared on the same theory,
and that an assistant engineer, then in the employ of the Public
Service Commission but who was not in its employ when the bids
on which the contract was let were received, was consulted and
advised the bidder that, inasmuch as there was no item in the
contract for stoops, the stoops, as well as the walls of the buildings,
would be included in the bid for underpinning. Over like objection
and exception, the plaintiffs were permitted to show that after the
making of this contract and after the claim had been made that
the plaintiffs were entitled to recover for underpinning, the chief
engineer, preliminary to inviting proposals on another section
of the work, changed the phraseology of the specifications with
respect to the underpinning so as to make it perfectly clear that the
payment for underpinning work would be limited to underpinning
the front walls of the buildings. The court having received expert
testimony on behalf of the plaintiffs with respect to whether the
work in supporting the stoops constituted underpinning, the city
called several engineers who took the opposite view and sustained

the chief engineer of the Public Service Commission in rejecting the claim. Upon this evidence and the provisions of the specifications, the court left it to the jury as a question of fact to determine whether this work was underpinning, or was restoration for which, under the specifications, the contractor was to be compensated by the payment which he received for excavation work.

There is no evidence or claim that any representation was made to bidders by any one representing the defendant concerning the construction of the contract and specifications with respect to underpinning; and if there had been, at most it might have afforded a basis for a suit in equity to be relieved from the contract, but on no theory would it be binding in an action predicated on the contract as this is. No authority has been cited and we know of none authorizing the receipt of evidence with respect to the construction which a bidder in preparing a proposal placed upon the contract which, if successful, he was to be called upon to execute, or upon the plans or specifications which were to form a part thereof, or which sustains the rulings of the court with respect to such construction by a former bidder or a declaration made to him by a subordinate employee of the Public Service Commission or of the city with respect to the construction of the contract and specifications. On the assumption that there was a question of fact for the determination of the jury on this point, the evidence to which reference has been made was not only incompetent but was most prejudicial, and the recovery, which was for the full amount claimed on the first cause of action, could not be permitted to stand. We are of opinion, however, that even the expert testimony was improperly received, and that the contract plainly limited the right of recovery for underpinning to the lineal feet front of the main walls of the buildings underpinned; and recently this court so held in construing a contract and specifications which were similar in all material respects to those in the case at bar for the construction of another section of the same subway. (*Daniels Co.* v. *City of New York*, 196 App. Div. 856.) The theory and basis upon which the plaintiffs here make a claim for underpinning the stoops are the same as those upon which a like claim was made in *Daniels Co.* v. *City of New York* (*supra*), but the learned counsel for the respondent has here presented them more elaborately, and he contends that our former decision is not controlling. It is, therefore, proper that we should refer to the evidence with respect to the general nature of the work of underpinning the walls of the building and with respect to the work which it is claimed constituted underpinning the stoops. In the case at bar it is perfectly clear that neither the stoops nor the walls underneath

them formed or constituted any support to the buildings, and the work done in supporting the stoops was materially different from that performed in underpinning the walls of the buildings. The walls of the buildings were supported in place by timbers, known as needles, which were passed through holes made in the upper part of the foundation walls at right angles thereto, and then excavations were made to the required depth, in some instances under the entire wall, and in some instances pits only were excavated at intervals, and then walls or piers, depending upon whether there was a complete excavation or pits only, were constructed from the base to the bottom of the foundation walls, which evidently were sufficiently cohesive to remain in place and permit the performance of this work when the weight of the buildings was thus transferred from them to the needles; and where piers were constructed steel I-beams running longitudinally under the old foundation walls were placed thereon; and then the timbers were removed and the holes made by them filled with masonry. Section 77 of the specifications required the contractor to " safely and permanently underpin adjacent buildings " and in so doing to use " such methods of construction or underpinning, pneumatic or otherwise, as special conditions shall require and the engineer shall approve." Section 78 provided that when the underpinning of a building is necessary and the work is done as provided in section 77, payment would be made " as and at the price provided in Schedule Item 4; " and item 4 provided that " for underpinning buildings including all incidental work and material," the contractor should receive for buildings of the description here in question the sum of " $82 per lineal front foot of building underpinned." Pursuant to the provisions of said section 77, the contractors in every instance submitted to the section engineer in advance of doing the work a sketch showing the manner in which they contemplated underpinning the wall of a building, and obtained the approval thereof before proceeding with the work; but in no instance was any such sketch submitted for approval or approved with respect to the work of supporting the stoops. Part of the claim of the plaintiffs was for underpinning twenty-nine stoops appurtenant to buildings, the walls of which were not underpinned, and the remaining claim for thirty-eight stoops is with respect to stoops appurtenant to buildings, the walls of which were underpinned. It is not *definitely* shown either by the testimony or by the documentary evidence whether the front walls of the buildings were on the street lines or to what extent, if any, they set back therefrom. The learned counsel for the city asserts that the stoops were all built upon the avenue and constituted encroachments thereon

which the city was under no obligation to support and might have removed. The documentary evidence *indicates*, however, that the stoops projected from eight and four-tenths feet to thirteen feet from the buildings and for the most part were over the avenue. In the main, the walls upon which the stoops rested consisted of rubble masonry with a brownstone veneering, and extended on either side and under the outer edge of the stoops, and they varied in depth, some of them being only a few feet deep and others extending nearly the depth of the foundation wall of the building. The evidence was uncontroverted, however, that in no instance did any weight of a building rest on the walls of the stoops, and that, with certain exceptions, the weight carried by these walls was not sufficient to exert any pressure on the subway structure when completed, which was the purpose for which section 77 of the specifications required safe and permanent underpinning of adjacent buildings. The exceptional instances in which the walls supporting the stoops would exert a pressure against the subway structure were where excavations were required to be made under the walls of the stoops in the performance of other subway construction work, such as sewer and ventilating chamber construction; and those are the only instances in which it became necessary to extend the foundation walls of the stoops downward or to support them by piers constructed underneath, as was done with respect to the walls of the buildings. Moreover, in such instances the foundation walls were not thus extended downward at the outset in order to support the stoops pending and after the construction of the subway, but after the complete construction of the subway. The other work done with respect to the support of the stoops, which it is claimed constituted underpinning, consisted principally in supporting the stoops against settling during the construction of the subway by passing needle beams through the walls, and after the construction of the subway, in filling in masonry in the holes in the walls through which the needle beams were inserted, and in cracks in the walls caused by the stoops settling away from the building, due to subway excavation, and being subsequently jacked back into place.

Section 62 of the specifications, so far as here material, provided that the contractor should at all times, by suitable bridging or other supports, maintain and support " all surface and sub-surface structures encountered during the prosecution " of the work in a " safe condition for the usual service and to the reasonable satisfaction of the owners," and obligated the contractor to protect from injury " all surface and sub-surface structures and surfaces of whatever character along the line of the work," and in the event

of injury thereto fully to restore the same " to as good a condition as before the injury was done," and that this work should all be at the expense of the contractor, and should be included in the prices stipulated in the schedule for excavation, " except as otherwise herein specifically provided." Section 81 of the specifications provided that the cost of removing walls or other parts of vaults from within the lines of excavation was to be included in the item for earth excavation, but that the restoration thereof within the ordered net lines of excavation would be paid for at the unit prices applicable to the several classes of work and material involved therein, but that this was not to be construed " as applicable to any work beyond the ordered net lines of excavation, which shall be at the contractor's own cost and expense." Section 99 of the specifications provided that the prices therein stipulated for excavation were to include, among other things, " the maintenance, support, etc., of all surface and sub-surface structures of whatever nature, payment for the maintenance and support of which is not herein elsewhere specifically provided for."

The learned counsel for the respondent contends that these provisions of the specifications are inapplicable for the reason that it is elsewhere provided, under the general provisions to which reference has been made, for payment for this underpinning; and he cites in support of his contention the testimony of experts to the effect that the work was known as underpinning, and also the case of *Broadway Realty Co.* v. *Lawyers Title Ins. & T. Co.* (226 N. Y. 335), which related to the marketability of a title and held that it was not marketable for the reason that a stoop appurtenant to the building constituted an encroachment of the building upon a public street. The point now presented for decision is not whether these stoops could be considered for any purpose part of the buildings, but whether by the contract or by any specifications with regard to underpinning the parties intended that the stoops should be deemed parts of the buildings, and whether the contractors are entitled to be paid for the work thus done in supporting them as for underpinning. If so, then the city will be obliged to pay for underpinning *two front walls* in thirty-eight instances, for it has already paid for the lineal foot frontage of the buildings underpinned with respect to the frontage measurement of the walls back of the stoops. That, I think, would be an erroneous construction and would in effect eliminate the word " front " from the provisions of the specifications wherein it is provided that the contractor shall receive for underpinning buildings, including all incidental work and material, $82 per lineal front foot of building underpinned. This, I think, clearly contemplates only one front

footage measurement. The engineer was, therefore, right in construing it as meaning the measurement along the front wall of the building only, and I think the defendant's motion for a dismissal of the first cause of action should have been granted, and that its motion should now be granted and the recovery reduced by $148,153.50, and $45,011.18, the interest computed by the court thereon.

The second cause of action is to recover six thousand six hundred and thirty-four dollars and eighty cents, being the difference between eight dollars and twenty-five cents per cubic yard on 1,843 cubic yards of excavation for emergency exits and a ventilating chamber, and four dollars and sixty-five cents per cubic yard which was allowed to the contractors therefor. On this cause of action a verdict was directed in favor of the plaintiffs for practically the amount claimed. The engineer classified this work under the classification made by the specifications for " rock excavations (except excavations for sewers and pipes)," the contract price of which was four dollars and sixty-five cents per cubic yard. The learned counsel for the city contends that under the general provisions of the contract with respect to the conclusiveness of the determination and certificate of the engineer, which are the same as those set forth in our opinion in *Daniels Co.* v. *City of New York* (*supra*) and need not be restated here, the determination of the engineer is binding and conclusive on the contractors in the absence of fraud or bad faith, of which there is no evidence. The learned counsel for the respondents claim that this work was incidental to the construction of the tunnel for the express tracks, and that the refusal of the engineer to classify it under the item in the specifications for " tunnel excavation (except tunnelling for sewers)," for which the contract price was eight dollars and twenty-five cents per cubic yard, was arbitrary and not merely an error in classifying the work, but constituted an erroneous construction of the contract and specifications, which is reviewable by the court under our former decision to which reference has been made. The plans required the construction of an exit for passengers on each side of the avenue from each of the express tracks to the local stations at Sixty-eighth street and Seventy-seventh street, and also a large ventilating chamber over and in connection with the express tracks. When the plans and specifications were prepared, it was expected that the entire excavation for the express tracks covered by this contract would be tunnelled through solid rock. The learned counsel for the respondents contends that since the construction of the exits and of the ventilating chamber were required only in connection with and for the express tracks, the excavation therefor constituted tunnel excava-

tion.  The plaintiffs presented evidence which was uncontroverted, tending to show that the cost of excavating the perpendicular tunnels for the exits and of excavating for the air chamber was greater than the cost of tunnelling for the express tracks.  Neither contract nor the specifications contained any separate classification for this excavation.  The engineer classified it as rock excavation above a point midway between the roof of the express tunnel and the floor of the local tracks and as tunnel excavation below that point.  The excavation was of the same general character and cost both above and below the line thus arbitrarily assumed by the engineer in classifying the work.  I am of opinion that this was not a question of classification of work or materials upon which the determination and certificate of the engineer were made conclusive, and that it was all tunnel excavation within the fair intent and meaning of the contract and specifications.  The facts being uncontroverted, the learned court, therefore, was right in directing a verdict in favor of the plaintiffs on this cause of action.

The third cause of action was for extra work performed and materials furnished by the contractors under the contract in constructing, removing, relocating, and restoring certain ducts containing electrical wires, and in supplying, furnishing and drawing cables into and through them.  On that cause of action, a verdict was directed in favor of the plaintiffs for $43,796.20.  The city conceded that the contractors performed this work and furnished these materials and that the amount claimed was the reasonable value thereof, but it denied liability therefor.  There were several duct lines under Lexington avenue within the area which the contractors were required to excavate by open cut.  The Empire City Subway Company had one on each side of the street extending from one end of the section to the other.  The Consolidated Telegraph and Electrical Subway Company had another duct line extending the entire length of the section.  It was on the easterly side from Sixty-seventh to Sixty-ninth streets and there crossed to the westerly side.  Each of the ducts carries many cables.  The Empire ducts carry the telephone and the police and fire department wires, and the Consolidated ducts carry the Edison Company's high and low tension wires.  The ducts were of tile encased in concrete, and within them there were individual channels for the cables.  At each street intersection, the continuity of the ducts was broken by a manhole, and the cables, which were of the length between the manholes, with some allowance for slack, were drawn through the ducts and hung upon racks along the wall and spliced together at the manholes.  The contract plans, upon which the bids were received, showed the duct lines as they then existed in

the avenue, but did not indicate whether they were to be retained in place or moved elsewhere during the construction of the subway or when it was completed. With respect to such sub-surface structures, section 39 of the specifications provided as follows:

### " DETAILED DRAWINGS.

" Section No. 39. The Engineer will prepare and furnish to the Contractor, from time to time as required, drawings and plans amplifying such details of the contract drawings as may be necessary, and drawings and plans necessary to show the adjustment and reconstruction of all surface and sub-surface structures wherever the reconstruction of the same is necessitated by the construction of the railroad. These plans must be strictly followed, unless local conditions should develop, during construction, suggesting changes, when, with the approval of the Engineer, such changes may be permitted."

Section 58 of the specifications required the contractors to give one week's notice in advance to the proper city officials and to all companies owning or having charge of surface or sub-surface structures along any part of the work, of their intention to commence operations along that part of the route and to co-operate with those in charge of said structures and furnish them reasonable facilities for inspecting " the methods of caring for their property." Section 59 provided that the engineer would prepare a tentative plan to be submitted to the parties interested with respect to the rearrangement of " sub-surface structures requiring removal and relaying or reconstruction, due to interference with the railroad structure " and required him to make any reasonable changes requested by interested parties and approved by him, and provided that a further plan should be made then, which, on the approval of the engineer, would be final. Section 60 provided that whenever it became " necessary to cut, move, change, or reconstruct any surface or sub-surface structures, or connections therewith, such work shall be done according to the reasonable satisfaction of the owners of such pipes or other structures." Section 61 required that all work of reconstruction or alteration should be done with reasonable dispatch, and that facilities should be provided to the end that the work would " interfere as little as possible with the practical working and use of such structures." Section 62 required the contractor by suitable bridging or other supports to maintain and support in a safe condition for the usual service and reasonable satisfaction of the owners " all surface and sub-surface structures encountered during the prosecution of the work; " and to protect such structures from injury, and in the event of injury, to restore

them to as good a condition as existed prior thereto, and that all of this work, including " all changes of surface or sub-surface structures made by the contractor for his own convenience in executing " the work, should be done at the expense of the contractor and included in the prices stipulated in the schedules for excavation, " except as otherwise herein specifically provided." Section 64 provided that changes of electrical conduits or ducts and their appurtenances, other than street railroad ducts, found in the streets, " made necessary because of physical interference with the railroad structure, and requiring the removal, relaying or reconstruction in other than the original position, will be paid for at the price stipulated in Schedule Item 127," and that the price per duct foot as therein provided was " to include the cost of all ducts in place; of all manholes, vaults, service boxes, and their appurtenances; of drawing cables and providing new cables where necessary; of the proper restoration of all services that may be affected by the changes in the duct lines; of such excavation and restoration of street surface as may be necessitated by the changes in duct lines, or allowance for damages or extra service other than is provided for items of the different classes of construction shown in the schedule, or where not susceptible of classification, then as otherwise provided herein." The provision " as otherwise provided herein " relates to the payment on the basis of cost plus ten per cent.

The plaintiffs showed by testimony of experts that all of these duct lines might have been retained in place with certain changes of manholes and " flattening out " of the ducts, where the roofs of the subway stations came close to the surface of the street, and that if they had been so retained in place, with these changes, there would have been very little additional excavation required, and that no substantial amount of new cable would have been required. The Commission estimated that 155,300 feet of duct would be required to be relaid as provided in section 64 of the specifications, and this estimate was inserted in the form of proposals for the use of bidders with, however, a note to the effect that it was understood that the quantities of the various items specified were given as a basis for the uniform comparison of bids, and were not in any way guaranteed or represented as correct or intended to be relied on, and that they should not be taken as final and should form no basis for any claim in case they did not correspond with the final measurements or quantities, and that the Commission reserved the right to increase or diminish or omit entirely any of the quantities or items. The contractors at first proceeded on the assumption that the ducts were to be supported and retained in place; and there is evidence tending to show that

that course was satisfactory to the owners of the structures; but the Commission prepared plans changing the position of most of the ducts and requiring that they be placed outside the open cut excavation and under the sidewalks. This required excavations from the surface of the carriageway and sidewalks outside the open subway cut about three feet in width and about seven feet in depth, and relocation of many manholes. This change of location of the ducts also involved installing new cables, owing to the fact that the old cables were not of suitable length, and the replacing of a part of the lines of duct by split tile ducts, which was less expensive than it would have been to replace the cables; and the telephone company, under an arrangement with the contractors with respect to the cost of the work, laid the split tile ducts. By reason of these changes in the location of the ducts, plaintiffs were required to lay 258,609 feet of new duct but were only allowed by the defendant for 190,030 feet thereof. After plaintiffs made the excavation for the New York Telephone Company's duct on the easterly side of the avenue and constructed the ducts therein, they made an arrangement with the telephone company by which it furnished the new cable required and installed it in the duct for $10,000. The evidence is uncontroverted with respect to the work required to be done by the contractors, upon which this cause of action is predicated, and the reasonable cost and value thereof. The city merely contends that under the provisions of section 62 of the specifications, to which reference has been made, the work was included in the unit price of fifteen cents per cubic foot for excavation. It plainly appears, however, that with the exception of the split tile duct, this work was ordered by the Commission and did not properly fall within the provisions of section 62 of the specifications, for the reason that it was not caused to any material extent by interference by the construction of the subway with the ducts as they were in place. The Commission did not direct the laying of the split tile duct lines, but it was shown that that was satisfactory to the owners and, if that course had not been pursued, it would have been necessary to move the cables into new ducts at a cost of $9,000 in excess of the cost of laying the split tile ducts. The recovery for the additional cables furnished was at the contract price, and that for the excavation was at the contract price for sewer excavations, which was quite similar, and that for the other work was on the basis of cost plus ten per cent. I am of opinion, therefore, that the court properly directed a verdict for the plaintiffs on this cause of action.

The fourth cause of action is for two items, (1) for $4,428.85 for gas pipes relaid owing to physical interference with the subway

structure or surface structures; and (2) $3,207.75 for gas pipes relaid due to interference with the split tile duct line. The court directed a verdict in favor of the plaintiff for the whole amount demanded on this cause of action. The city claims that since the split duct line was not ordered by the Commission and was laid pursuant to a private arrangement between the contractors and the telephone company, there can be no recovery therefor. As already observed, it appears that the laying of the split duct line was an economical arrangement, and the cost thereof and of changing the location of the gas pipes incident thereto was less than it would have cost to remove the cables into new ducts. Section 63 of the specifications, as far as here material, provided that changes of gas pipes rendered necessary owing to physical interference with the railroad structure and requiring the removal, relaying, or reconstruction of the pipes and appurtenances in other than their original positions, would be paid for at the prices stipulated in Schedule Items 77–99, which provided that the prices were to be " per lineal foot of pipe laid, including all work, labor, and material incident to such laying " except that if new pipe had to be provided and was ordered by the engineer, it would be paid for in addition to the price paid for laying, etc., at the price stipulated in Schedule Items 100 and 101, which related to the cost of new pipe delivered on the work. With respect to the claim for relaying gas pipes, with the exception of $450 thereof, the city contends that part of the pipe for which the claim is made was moved or relaid for the convenience of the contractor, but the uncontroverted evidence is that the plaintiffs made no claim for gas pipes removed and relaid solely for their convenience and that it was necessary, owing to interference with the subway construction, to change the location of all of the gas pipes for which they made claims. An item of $450 was for lining up, grading, and calking the joints of a thirty-six-inch gas main, which was required, not by the Commission, but by the gas company, before it deemed it safe to admit gas into the pipe. There was evidence on the part of the plaintiffs, which was uncontroverted, to the effect that this was equivalent to relaying the gas main and that the reasonable value thereof was $4.50 per lineal foot. At the close of the evidence the city moved for a dismissal of this cause of action and the plaintiffs moved for a direction of a verdict in their favor thereon. The court invited a suggestion as to whether there was any question of fact, and no claim was made by the city that there was a question of fact for the consideration of the jury with respect to this cause of action. The court thereupon directed the verdict. It is now too late for the city to contend that it was for the jury to pass upon the expert testimony.

The fifth cause of action was for $30,249.66, for the cost of extra work not contemplated by the contract, plans or specifications. It consists of an item of $2,809.29 for making the tunnel larger than was contemplated, owing to the fact that soft earth and mud were encountered between a point 100 feet south of Seventy-fourth street and a point just north of Seventy-fifth street; and an item of $21,931.78 for the excess cost of excavation incident to encountering this soft earth and mud; and an item of $5,508.59 for reconstructing the local tracks caused by the settlement thereof at that point. The court directed a verdict for the full amount of the claim. The basis on which a recovery was had on this cause of action was the difference between the amount it cost the plaintiffs to construct the tunnel between these points and the amount it would have cost if they had not encountered the soft ground and mud. The evidence with respect to the plaintiffs' damages on that theory is uncontroverted and is of a most satisfactory nature, for it is based on the actual cost of construction of the tunnel between these points, and the actual cost to them of constructing the tunnel for the same distance at other points where the construction was through solid rock, which it was supposed would be encountered at this point. The city contends that in any event this was not the proper measure of damages and that the recovery should have been limited to the difference between the actual cost of the construction of the tunnel between these points and the amount received by the contractors therefor. Manifestly that would not afford the contractors adequate relief, for it would eliminate their profits on the construction of the tunnel between these points. This cause of action was based on misrepresentations induced by borings made in behalf of the Commission to show the nature of the material to be encountered. The borings were shown on the supplemental drawings submitted for the inspection of bidders, which, however, contained a note to the effect that they were not guaranteed. The contract drawings, however, which presumably were based on these borings and were likewise submitted for the inspection of bidders, indicated that the tunnel was to be constructed throughout the entire distance through solid rock, and they contained no note or information to the effect that bidders might not rely thereon with the exception of a note as follows: " If rock is not encountered, the design of the side walls and floor will be modified." There was a map on file with the Commission at this time showing that formerly a creek crossed the avenue at this point, and if that had been taken into consideration by the engineers representing the Commission, they should have known that the avenue had been filled in at this point over the bed of the creek, and should have

anticipated that soft earth or mud might there be encountered. Owing to the fact that soft earth and mud were thus encountered, the contractors were obliged to employ a pneumatic method of tunnelling involving the use of compressed air to prevent the earth between the tunnel and the cut some twenty-eight feet above, in which the local tracks were constructed, and at the sides, from falling in; and it became necessary to change the plans by materially thickening the side and upper walls of the tunnel to support the earth.   This contract also contains the usual provisions that the bidders must inspect the premises themselves; but I am of opinion that the authorities, the latest of which is *Foundation Company* v. *State of New York* (233 N. Y. 177), holding that in such case ordinarily bidders shall have no claim for extra work and must at their peril discover the nature of the material to be encountered, are not controlling on the facts of this case, which, I think, bring it fairly within the doctrine of *Faber* v. *City of New York* (222 N. Y. 255).   Here not only was the contract let on a unit basis instead of for a gross sum, but it was for work to be done under one of the principal thoroughfares of the city, and it was not expected that the bidders should make and rely on their own borings, and it was perfectly evident that that would have been impracticable even if they could have obtained the necessary permits therefor, because the street was left open for public use until after the work of construction was actually commenced, and the extra work was rendered necessary by conditions which might have been, but were not discovered by the Commission and could not have been discovered by bidders.   Moreover, I am of opinion that this claim of the contractors comes within the provisions of article XII of the contract, which, so far as here material, provides as follows:

" WORK NOT SUSCEPTIBLE OF CLASSIFICATION.

" Article XII. In case any work or materials shall be required to be done or furnished in or about the Works — whether specified herein or indicated on the plans or not — which are not susceptible of classification under the Schedule of Unit Prices, the Contractor shall and will if ordered by the Engineer do and perform such work and furnish such materials at and for the actual and necessary net cost in money to the Contractor for labor and for material, where new material is used and in addition thereto ten per centum (10%) of such net cost for the use of tools and plan, superintendence and all other expenses incidental to the performance of such work and the furnishing of such material, and the Contractor shall have no further claim in excess of the above; but this method of payment shall not apply to the performance of any work or the furnishing

of any material which in part or in whole is susceptible of classification under such schedule, which work or material shall be paid for in part or in whole, as the case may be, at the unit price given in such schedule, except as herein otherwise expressly provided."

If these provisions of the contract are to have any scope, it seems to me that they fairly cover this claim, for concededly this work was unforeseen and the actual cost of constructing the tunnel between these points was increased by this unforeseen condition, for the amount of which the recovery was had. I am, therefore, of opinion that the court was also right in directing a verdict on this cause of action.

The sixth cause of action was to recover a balance of $25,000, alleged to be owing on account of extra work, labor and services performed and material furnished at the special instance and request of the defendant. but the plaintiffs on the trial abandoned all of that cause of action with the exception of nine items for which they claimed the aggregate amount of $9,200.40. The court directed a verdict in their favor with respect to seven of the items, and left the other two to the jury, and the verdict was rendered in favor of the plaintiffs thereon. The first item for $1,875.60 and the second for $1,719.30 were for laying concrete under the side walls of the tunnel and for excavating therefor. This work was all beyond the " ordered line of excavation," which was a line one foot, two inches, below the base of the rails. The contractors were required by an order of the engineer to change the outside line of the structure which required excavation beyond the " ordered line of excavation." It appears that the contractors had been paid for like work on other parts of the contract. The facts were uncontroverted and the right of the plaintiffs to recover for these items depended upon the construction of the contract work. I am of opinion that the plaintiffs were entitled to recover therefor and that the verdict thereon was proper and right.

Item 3 for $648 is for extra concrete in the side walls, and item 4 for $2,508 is for extra tunnel excavation therefor. This work was required by the engineer and the city paid the contractor for other similar work. These claims were predicated upon a change in the plan. The only point presented by the evidence with respect to these two items which the defendant claimed required submission to the jury was as to whether this work was done in a.medium rock section or in a hard rock section, and the jury on conflicting evidence found in favor of the plaintiffs.

The 5th item for $327, and the 6th item for $292.50, and the 7th item for $440, and the 8th for $560, were for gravel placed in soft ground and the excavation therefor under the floor of the

local level and for drainage pipes. This work was not contemplated when the contract was let and would not have been necessary but for the fact that soft earth and mud were encountered, and water therefrom saturated the bottom of the local cut, rendering it necessary to excavate six inches below the sub-grade and to refill with gravel in order to obtain a firm foundation on which to lay the concrete bottom. This also necessitated the laying of tile drains to carry the water to a sump.

Item 9 for $830 relates to extra rock excavation consisting of triangular pieces of rock at points where the sewer trenches and the subway excavation met, the removal of which became necessary for the safety of the subway and to expedite the construction thereof.

I am of opinion, therefore, that the plaintiffs were entitled to recover on the sixth cause of action in so far as they have recovered thereon.

Finally the appellant contends that these claims in behalf of the contractor were not presented to the chief engineer on or before the fifteenth day of the month following the accrual thereof, as required by article 43 of the contract, and that by virtue thereof the claims were forfeited. These claims were asserted in behalf of the contractors from time to time as they were required to perform the work, and they were thoroughly understood by the chief engineer, and he understood perfectly well that the contractors did not intend to waive them. If said article 43 applies to such claims, I am of opinion that the defendant should be deemed to have waived the formal presentation thereof. (See *Foundation Company* v. *State of New York, supra.*)

The other points have been examined and we find no merit therein.

It follows that the judgment should be modified, without costs to appellant, by eliminating therefrom the amount represented by the recovery on the first cause of action as already stated, and as so modified, affirmed.

Clarke, P. J., Dowling, Page and Merrell, JJ., concur.

Judgment modified as directed in opinion and as so modified affirmed, without costs. Settle order on notice.