## CITY OF DALLAS v. SHORTALL.
### No. 11751.

Court of Civil Appeals of Texas. Dallas.
Oct. 5, 1935.

Rehearing Denied Nov. 23, 1935.

H. P. Kucera, City Atty., and A. J. Thuss and J. Manuel Hoppenstein, Asst. City Attys., all of Dallas, for appellant.

R. G. Storey and E. Taylor Armstrong, both of Dallas, for appellee.

JONES, Chief Justice.

In a suit in a district court of Dallas county by appellee, Thomas H. Shortall, against appellant, city of Dallas, a municipal corporation, as defendant, appellee recovered damages in the sum of $29,-803.96; $4,803.21 of this sum being accrued interest at the time the judgment was entered on October 14, 1933. The judgment represents the amount appellee claimed to be due him as damages over and above what appellant claims was due under the construction contract. Appellant has duly perfected an appeal to this court, and the following are the necessary facts:

On March 18, 1930, appellant entered into a contract with Henry C. Beck, contracting under his trade-name of Central Contracting Company, to construct a tunnel through a hill or ridge to divert the waters of Kidd Springs branch into Coombes creek. These two streams are approximately parallel with each other, and are separated by the hill or ridge through which the tunnel was to be excavated. The highest surface of the ridge is approximately 85 feet above the tunnel.

The engineering department of the city of Dallas prepared very elaborate plans and specifications and accompanied same by maps, profiles, and drawings upon which bidders were required to make their estimates of the costs of a finished construction; the bidders were required to furnish two bids, one on the basis of "gunite" construction, and the other on the basis of a concrete construction; the latter being a much heavier and more costly construction. The "gunite" or lighter construction could only be used, provided the tunnel was excavated through solid rock; otherwise, the only practical construction would be the heavier and more costly concrete construction.

Appellant's engineering department, after it had located the course of the tunnel, made what purported to be a survey of the formation to be encountered in excavating the tunnel. This survey determined the formation to be encountered by boring from the surface, making such borings at a distance from each other of from 50 to 100 feet throughout the length of the tunnel. These borings established the fact that rock formation would be encountered at a relatively short distance, from the surface from which the engineers concluded that the tunnel, throughout the greater portion of its length, would be excavated through a solid rock formation, and indicated such formation on the map, accompanying the plans and specifications, as a part of same, by a white line, that the construction would be through rock formation.

The bidders were requested to submit bids on both the "gunite" and the concrete construction. The bid of the Central Contracting Company was accepted by appellant as the lowest bid on each character of construction, and Henry C. Beck, trading as Central Contracting Company, was awarded the contract for the "gunite" construction; both parties accepting as true the fact that the tunnel would be excavated through solid rock formation, as shown by the survey made by appellant's engineers, and the contract in question was entered into. Before work was begun, and without notice to appellant, Beck, through his trade-name of Central Contracting Company, sublet or assigned the entire construction work called for by the contract to appellee, Thomas H. Shortall. By this agreement between appellee and Beck, appellee was to do the entire work and was to receive the entire consideration under the contract, but was to pay to Beck 10 per cent. of the amount received. No written notice was served on appellant of this agreement, and no formal permission was given by appellant to permit such an agreement to be entered into.

Appellee took charge of and completed the entire construction. The monthly estimates were made in the name of the Central Contracting Company, and vouchers issued to such company, as payee. Representatives of appellant's engineering department, to which department was committed supervision of the construction, were present at all times during the construction of this tunnel, and knew from the beginning that appellee was doing the entire work. At a meeting of the city commissioners, at which three of the five were present, appellee appeared before them as the person doing the work.

The contract is very lengthy, and a large portion of it is not necessary to be given for an understanding of the issues involved on this appeal. Those parts of the contract necessary to a disposition of the case will either be given in substance or copied in hæc verba. The contract declares that the contractor shall, "At its own cost and expense furnish all tools, labor, materials, machinery, appliances, equipment,

appurtenances and supplies necessary for the construction and performance of the work herein contracted to be done, and to do, and perform all the necessary work in the construction, installation and building in every detail of a branch tunnel in District No. 24 for the City of Dallas to be located and constructed in the County of Dallas, State of Texas, as follows: From Kidd Springs Branch to Coombes Creek Retention Basin and to do all the necessary excavation therefor in strict accordance and compliance with the plans, specifications, profiles and maps and drawings prepared by the city engineers, and to fully complete and construct said work in strict accordance with the true purpose and design of said profiles, plans and drawings, specifications and in accordance with the proposal of the said contractor."

Section 7, in effect, provides that the contractor shall not be entitled to any claim for damages for any hindrance or delay, for any cause whatever, in the progress of the work; but that such contractor may have an extension of time for completing the contract when the hindrance or delay resulted "from any cause entirely beyond the control of the contractor."

By section 12, the city engineer is given the power to make alterations in the line, grade, plan, form, or quantity of the work herein contemplated; and if such alterations diminished the quantity of work to be done, such alteration shall not constitute a claim for damages, or for anticipated profits on the work dispensed with. If, however, the alterations increased the amount of work, such increase shall be paid for according to the quantity actually done, and according to the price or prices stipulated for such work, or similar work, in this contract.

Section 14 forbids the contractor to transfer, sublet, or assign the contract, or to sublet any part of the work, except for delivery of material, or to in any way abridge the terms of the contract and the specifications, "without first obtaining the consent of the City of Dallas expressed by a resolution of the Board of Commissioners, and upon such conditions as may be prescribed by the said Commissioners." A like prohibition extends to the assignment of the moneys payable or arising under this contract, without first obtaining the consent of the board of commissioners.

The first paragraph of section 28 reads: "That it is further mutually understood that, as shown by the bid of the contractor and the tabulation of the same as shown by the report of the said Engineer, the said contractor agrees to perform the work herein contracted for according to the above schedule of prices and to do and perform the same for the sum of Forty-Five Thousand and Fourteen and 82/100 ($45,014.82) Dollars, which said sum shall represent the full compensation to be paid the contractor, provided however that should the quantities of the said work be diminished or increased, or should the said contractor be required to perform any extra work, the same shall be paid for, or in the case of diminished quantities the same shall be subtracted from said contract price according to the methods prescribed by the terms of this contract, provided further, however, that no extra claim shall be allowed for any real or asserted work unless the same shall have been approved by the Engineer and the committee in charge of the said work and duly certified to the Mayor and Board of Commissioners."

The Central Contracting Company's bid was on various items or units entering into the construction of the tunnel, and the bid was what is known as a unit bid, rather than a lump sum bid. The total sum of these units amounted to $45,014.84 for a "gunite" construction. The amount of appellee's bid on the heavier concrete construction was approximately $21,000 in excess of the bid for the "gunite" construction. Each of these bids was based on the fact that solid rock would be encountered, as designated by the map, and neither bid comprehended the formation that was actually encountered in the construction of the tunnel. Solid rock is the ideal formation for tunnel construction.

A large portion of the land under which this tunnel was to be constructed was owned by Mr. Sam Leake. At the time the plans and specifications were drawn, the survey made, the maps prepared, and the contract entered into, appellant had not secured the right of way across Mr. Leake's land, and hence did not have the legal right to subject such land to the use that was necessary for the construction of the tunnel. Nor was this right of way secured when appellant directed that the work begin. Appellee, who had subcontracted the entire work, had assembled his materials, machinery, and a number of skilled em-

ployees, and had actually begun the work of construction, without knowledge of appellant's failure in this respect. At once an injunction was issued on the suit of Mr. Leake, restraining and prohibiting any such trespass on his land. The work was stopped and appellee was compelled to stand by with a number of skilled employees remaining idle, with the necessity of appellee retaining them in his employ and paying their wages. This condition lasted for several weeks until appellant finally secured the right of way from Mr. Leake, and then the work proceeded.

It was soon ascertained that there was no solid rock formation which would sustain a "gunite" construction, and that by reason thereof a shaft of much larger dimensions would have to be constructed, and that the construction could not continue from the north end of the tunnel, where it had been begun, but that such shaft would have to be sunk about the center of the ridge under which the tunnel was being constructed; that the heavier concrete construction must be made; and under such condition the following letter was written under the direction of appellee to the city engineer: "After our several conferences in reference to our contract on Kidd Springs, District #24, the writer feels that the Central Contracting Company is entitled to compensation for the following: 1. To be paid for the full amount of concrete that goes into the tunnel, measurements to be made at the mixer. 2. Extra rock excavation caused by faults and slips. 3. Compensation for delay at the beginning of said contract. 4. Excavation for shaft at station 10 plus 45, it being impossible to go into the north portal because of bad rock conditions. 5. Compensation for all timbers left in place. I would appreciate a meeting with the City Commission on these matters at your earliest convenience as we are ready to start concreting at once."
—to which the city engineer made the following reply:

"Replying to your communication of July 24th re construction of the Kidd Springs Tunnel in District #24 you are advised that this department will join you in a recommendation to the City Commission the adoption of the following: (1) That your Company be paid for the construction of the tunnel throughout its limits, adopting the heavier type of construction as shown on the plans, concrete lining six inches in thickness, and will agree to pay for all reinforcement required in this construction, measurements to be computed upon the basis of the six inch lining, upon the price bid for this class of work, namely $18.18 per cubic yard in place for such material. (2) For extra rock excavation and the refilling of same with concrete at $18.18 per cubic yard of faults caused by slips in that portion of the tunnel where it is apparent that said faults and slips were caused by conditions over which the contractor had no control, and where it is apparent to the engineer that by exercise of due precaution in the blasting or excavating of the tunnel, that said faults and slips were beyond the control of the contractor in the execution of his work, said faults, slips, and the yardage therein to be determined and agreed upon by the engineer and contractor at the time that the forms are set for the concreting of the different sections throughout the tunnel. (3) In answer to your request No. 5, we will also agree to pay for all timber left in place in the tunnel when such timber or lumber is left by order of the engineer.

"We are unable to agree with you on your request No. 3 for compensation for delay at the beginning of said contract, as this is fully covered in Section 7 of the Standard City of Dallas Contract. We are unable to agree with you on your request No. 4 for compensation for the excavation of the shaft at Station 10 plus 45, as this is a construction measure, is not shown on the plans nor provided for in the contract, and was not contemplated by the City."

It will be observed that appellant, through its engineer, acceded to the first, second, and fifth demands made by appellee in the name of the original contractor; that it refused to accede to the third and fourth demands. These demands that were granted by the city, in effect, changed the contract from one of "gunite" to the one of heavier concrete construction; and appellant made this change to conform to the Central Contract Company's bid on such construction. It further appears that appellant, through its engineer, declined to allow appellee any damage for the delay occasioned by appellant's failure to secure the right of way before it required the work to begin. This was embraced in the third demand in the letter to the city engineer. It also appears that appellant, through its engineer, declined to allow any extra pay for

the extra expense for the excavation, necessitated by the formation encountered, being radically different from the formation shown from appellant's survey, and recorded in the map accompanying the plans and specifications. The action of the city engineer was authorized by a meeting of appellant's board of commissioners.

Notwithstanding appellant's refusal to comply with appellee's requests in said letter, in respect to the extra expense occasioned by the mutual mistake of the parties in the character of formation to be encountered in the excavation, appellee at a loss completed the work and finished the tunnel, to the satisfaction of appellant, and then instituted this suit to recover on the demands in his said letter, which had been denied by appellant.

The case was tried to a jury, submitted on special issues, and on such issues the jury made the following findings: (1) The Central Contracting Company has not been paid in full for all of the work performed on the construction of the tunnel; (2) the city of Dallas, through its agents and representatives, knew and recognized that plaintiff, Shortall, was performing the entire construction of the tunnel, as a subcontractor; (3) the plans, specifications, and test made on the ground at the site of the tunnel by defendant or its agents disclosed a solid rock condition encountered in the driving of the tunnel; (4) the condition of the soil and formation which were encountered in the driving of the tunnel by the plaintiff were not reasonably anticipated by either party to the contract; (5) a formation of the soil was encountered in the driving of the tunnel substantially different from that shown in the plans and specifications; (6) the original plans and drawings prepared by defendants for the construction of the tunnel were substantially changed as the excavations had taken place; (7) plaintiff has suffered damage by reason of the performance of the contract in question over and above the amounts paid by defendant to the Central Contracting Company; (8) because of soil conditions actually encountered, different from those shown in the specifications, it was reasonably necessary to sink the central shaft in question at the place it was sunk; (9) the reasonable cost to plaintiff for the construction of the central shaft amounted to $2,236.79; (10) plaintiff was delayed in beginning the work under the contract through no fault of his own; (11) plaintiff was delayed in beginning the work in question; (12) plaintiff reasonably suffered damages because of such delay, in the sum of $2,677.36; (13) plaintiff has suffered damages in connection with the extra costs by reason of the excavations of the soil and formation encountered, instead of the solid rock; (14) plaintiff suffered damages because of such excavations and disposition of the material encountered in excess of the costs of the same excavations and disposition of solid rock in the sum of $4.38 per cubic yard in excess of the bid price; (15) plaintiff suffered damages because of the necessity of hauling the soil and excavations away from the shaft he erected at the central point instead of at the north end; (16) the reasonable amount for hauling away such soil and excavations from the central shaft, instead of from the north point, was $1,139.10; (17) no agreement was reached for the further prosecution and payment of the work on the tunnel between the city of Dallas and the Central Contracting Company, as a result of the letter written by the Central Contracting Company on July 24, 1930, and the answer thereto by John M. Young, written on August 6, 1930, wherein John M. Young acceded to certain of the demands and denied others; (18) the city of Dallas, acting through its agents and representatives, was not led to believe that, because of the acceptance by the Central Contracting Company of the checks for monthly estimates, no further dispute or cause existed as to the compensation to be paid for the finished job.

In paragraphs preceding the submission of the special issues, the court defined the terms "subcontractor," "reasonably anticipated," "substantial difference," and "substantially changed." The findings of the jury, as above given, are supported by the pleadings and by substantial evidence, and are adopted as the findings of this court.

This record is very voluminous and appellant has 199 assignments of error, and, with these assignments as a basis, has presented 73 propositions of law. From these assignments of error, it appears that appellant's primary contention is that appellee has stated no cause of action in his petition, in that all of those matters complained of, except the matter of delay, were merely construction difficulties, and that these were assumed by appellee in his undertaking to do the work for the price bid and under the contract the Central

Contracting Company entered into, and therefore whatever expense that he encountered in the prosecution of the work must be borne by him; that in respect to the delay suffered by appellee in the prosecution of the work, the contract provided the exclusive remedy, which only allowed him an extension of time for the completion of the work, and affirmatively forbad the recovery of any damages suffered by reason of such delay.

On the other hand, appellee contends that the difficulties he encountered in his prosecution of the work, and the extra expense he was caused to suffer in prosecuting the work to a conclusion, were occasioned by encountering a character of formation wholly different from that contemplated by both parties, and wholly different from that shown by appellant's presurvey of the formation to be encountered, and on which the Central Contracting Company was invited by appellant to make estimates of the cost and present the bid. In reference to the delay caused by the Leake injunction, appellee contends that such delay was neither contemplated by the parties nor included in that portion of the contract forbidding damages to appellee for any delay; that the duty rested on appellant to secure this right of way before it required appellee to begin the work of construction, and is responsible to appellee for the damages suffered by reason of the failure to perform such duty.

In line with its theory of the case, appellant presented general and special demurrers to appellee's petition alleging the items of damage, requested peremptory instruction in its favor at the conclusion of the evidence, objected to the submission of each special issue, and, after the verdict of the jury was returned, filed a motion for judgment non obstante veredicto. On an adverse ruling of the court on all these matters, appellant has duly assigned errors, and properly presented same to this court. In addition to these primary contentions, appellant has presented various assignments of error on the ruling of the court in respect to the admission of evidence, or the refusal to admit evidence, and also assigned error to the adverse ruling of the court on its complaint of misconduct of the jury.

As appellee did not execute the contract and was not a formal party thereto, but claims, as shown by his petition, as a subcontractor to perform all of the work, appellant contends that appellee cannot maintain the suit and is not entitled to recover any damages, for the reason that a clause in the contract forbids any such subletting of the contract without notice to appellant, and, as no permission was secured for such subletting of the contract by the prescribed method of a resolution adopted by the city commission, appellee cannot recover.

As is obvious from this record, the trial court rejected appellant's theory of the case, and adopted appellee's theory, and submitted the case to the jury on such theory. The petition stated a valid cause of action for recovery, and appellee, having done the entire work of constructing the tunnel as subcontractor under the Central Contracting Company, who executed the contract, had the right to prosecute this suit for damages; for, under the findings of the jury, appellant knew that appellee was performing the entire work, and permitted him to perform such work without objection. Under the findings of the jury on this issue, appellee is either impliedly substituted for the original contractor, or appellant, cognizant of the fact that appellee was doing the entire work, waived the provision in the contract as to the manner in which the contract might be sublet or assigned, and is estopped to assert the enforceability of such clause of the contract. City of San Antonio v. French, 80 Tex. 575, 16 S.W. 440, 26 Am.St.Rep. 763; Sluder v. City of San Antonio (Tex. Com.App.) 2 S.W.(2d) 841, and authorities cited in these cases.

Then again, the Central Contracting Company intervened in this case and, after such intervention, assigned its cause of action to appellee. If there was no subletting or assignment of the contract, then the Contracting Company constructively performed the work, and could assert and assign to appellee the same cause of action.

Appellee's right to recover under his allegations of each item of damage asserted will be discussed hereafter. The court did not err in refusing the peremptory instruction, and did not err in overruling the motion for judgment non obstante veredicto. See authorities cited under the discussion of these items of damages.

Does the provision of paragraph 7 of the contract preclude appellee from recovering the damages he suffered, occasioned

by the delay, because of the Leake injunction? As shown above, the contract provides that the contractor shall not be entitled to any claim for damages for any hindrance or delay for any cause whatever in the progress of the work, but if the contractor should be delayed for any cause entirely beyond his control, then the time for completing the work might be extended for a time equal to such delay. The delay for which damages were awarded by the judgment is not the character of delay comprehended by such clause of the contract. Such a delay is one encountered by the contractor in the progress of the work, whereas the delay under review is one encountered in the very beginning of the work, brought about by appellant's failure to secure the right of way before it directed the work to begin. The contract necessarily assumed two fundamental facts, viz.: (1) That appellant had the right to construct the tunnel under the premises involved; and (2) the contractor had the ability to do such work. Pitt Construction Co. v. City of Dayton (C. C.A.) 237 F. 305, and authorities therein cited.

When the contract was entered into, appellant had failed to secure the right of way over a considerable portion of the land under which the plans and specifications called for the construction of the tunnel. At the time the construction work was directed by appellant to begin, there existed in appellant no right to construct the tunnel at such place. Appellee had the right to rely on the fact that appellant had performed its fundamental duty of having secured the right of way before the work of construction would be directed to begin. It was necessary for appellee to assemble the machinery and to employ the skilled labor necessary to this construction, when the work was directed to begin. When this had been done and the work actually started, an injunction was issued by the court, restraining such trespass upon the Leake property. That this injunction was properly issued at the suit of the property owner is not, and cannot, be questioned. On such a condition, wholly unanticipated by appellee, he was compelled to stand by and pay his skilled employees in order that work might promptly begin, when appellant had performed its primary duty of securing the right of way. The case of Pitt Construction Co. v. City of Dayton, supra, is one under very similar facts, both as to the provision of the contract in respect to the remedy for delay, and as to the character of delay encountered by the contractor, and is the only case we have been cited by either appellant or appellee, which we consider as authority on this question. The reported case holds that the contractor could recover damages, notwithstanding the contract remedy for ordinary delay. Appellee had the right to recover on this issue.

In respect to the other three items of damage, viz. (1) the cost of the sinking of a central shaft, (2) the excess cost of the disposition of the excavated material, because of the unanticipated formation encountered, and (3) the excess cost of hauling away the soil and excavations from the central shaft instead of from the north point of the tunnel, as each rests on the same principles of law, they will be discussed together.

If there had been no presurvey made by appellant showing the character of formation, and bids, at least impliedly requested to be made on such survey, then appellant's contention that the formation actually encountered would be matters entirely incident to the cost of construction, and such cost appellee would have to bear. Under such condition, if the Central Contracting Company based its bid on the belief that there was a solid rock formation through which the tunnel could be constructed, it would be the contractor's mistake, uninfluenced by any representations of appellant as to the character of formation. The rule of law contended for by appellant, under the facts we have stated, is the necessary result of giving effect to the contract as made. And again, if appellant had represented to bidders that the character of formation shown on its map must not be relied on as the true character of formation, but that each bidder must satisfy himself of the character of formation to be encountered, or some similar expression, then appellee would have had no cause of action for either of these three items of damages.

Such, however, is not this case, and the rule of law above stated does not apply to the facts of the instant case. This case clearly presents one of mutual mistake, in that appellant represented, from the results of its presurvey, that the construction would be through solid rock, and believed and relied on such fact in the execution

of the contract; for the contract entered into calls only for "gunite" construction, which construction is much less expensive than a concrete construction, and could only be used provided the tunnel was excavated through solid rock. The Central Contracting Company believed that the pre-survey, showing construction through solid rock, was correct, and executed the contract for the "gunite" construction, relying thereon. The bidder was given no time to make an independent survey. The conclusion, therefore, is inescapable that the character of formation encountered was not that which was contemplated by either party to the contract.

The character of formation found by appellee after he began excavations at the north end of the tunnel, in the prosecution of the work, compelled the more costly concrete construction, in lieu of the contract "gunite" construction. It will be remembered that the Central Contracting Company, at appellant's request, had bid on both character of constructions, and the bid on the concrete construction was also pronounced the lowest and best bid. When it was discovered that the "gunite" construction could not be used and that the concrete construction must be used, appellee wrote the letter to appellant, heretofore quoted, making demands for an increase in the consideration, because of the increased cost incident to the heavier and more costly construction necessary, and for pay for the other expenses incident to the formation encountered. Appellant allowed the increased construction price, because of the change in the contract from "gunite" to concrete construction, but denied the other demands. Appellant claims the increase in the price of the construction allowed (a little in excess of $21,000) was in accordance with the Central Contracting Company's bid for such class of construction, and this appears to be correct. This bid, however, was predicated on the basis that the construction would be through solid rock, and hence at a much less cost in the matter of excavation, and the hauling away of the excavated substances, than under the character of formation actually encountered.

 The rule of law that obtains in this character of case is aptly stated by the editor of the annotations on the case of J. W. Maney et al. v. City of Oklahoma City, 76 A.L.R. page 269, to wit: "The general rule may be deduced from the decisions that where plans or specifications lead a public contractor reasonably to believe that conditions indicated therein exist, and may be relied upon in making his bid, he will be entitled to compensation for extra work or expense made necessary by conditions being other than as so represented." This is supported by a long line of authorities, none of which are from Texas. We adopt the announcement of this rule of law as governing the case. Christie v. United States, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933; Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898; McGovern v. City of New York, 202 App.Div. 317, 195 N.Y.S. 925; Maney v. Oklahoma City, 150 Okl. 77, 300 P. 642, and the other cases cited in 76 A.L.R. page 269.

 It is true that appellee was paid approximately $21,000 in excess of the consideration named in the contract. This sum represents only the difference in the cost of the concrete construction over the "gunite" construction, and is the difference in the bid made by the Central Contracting Company on the two different kinds, of construction. This extra sum does not take into consideration the extra cost of the concrete construction, because the formation encountered was radically different from the solid rock formation contemplated by the parties. If it was necessary to change from the "gunite" construction to the heavier and more costly concrete construction, because of the formation encountered that was not contemplated by the parties, it is just as necessary to pay for the extra cost of construction incident to the character of formation actually encountered. It appears to us that justice between the parties can only be maintained by allowing appellee the extra cost incident to the mutual mistake of the parties, in respect to the formation encountered, and we overrule appellant's contention to the contrary.

Appellant has properly presented assignments of error on the adverse ruling of the court in respect to the reception of evidence; also assigned error on alleged misconduct of the jury. We have carefully examined all of these assignments of error and do not believe that any of them present reversible error. To discuss such assignments separately would extend this opinion to an inexcusable length, and we shall not attempt to do so.

It necessarily follows that, in our opinion, the judgment of the lower court should be affirmed, and it is so ordered.

Affirmed.

### On Motion for Rehearing.

Appellant has filed a very lengthy motion for rehearing, in which complaint is made of errors, in the main, on immaterial matters in the statement of facts in the original opinion.. It was stated in the opinion that the difference between appellee's bid for the heavier construction and the bid on the gunite construction was approximately $21,000. We made this finding from the fact that appellee was paid approximately $21,000 additional to the amount of the bid on the gunite construction, because of the change to the heavier concrete construction, and because it was stated in effect in appellant's brief that the additional amount allowed appellee, because of the change in the construction, was in accordance with the bid that was originally made on the concrete construction; however, the record shows that the difference between the two bids was approximately $5,000, and we will correct the original finding in this respect.

The complaint is also made that, in stating at a meeting of three of the commissioners in the city hall, to discuss the matter growing out of the necessary change in the construction from gunite to concrete, that this was a regular meeting of the city commissioners. The opinion does not state that it was a regular meeting of the city commissioners, but the language employed might convey that impression, and to remove any doubt we find that such meeting was not at a formal but at an informal meeting of the three commissioners.

As the original opinion shows, appellee's right to maintain this suit rests on the mutual mistake of appellant and the Central Contracting Company as to the character of formation to be encountered in constructing the underground tunnel. Appellant made a presurvey to determine what the character of formation to be encountered would be, and designated rock as the formation, on the plat accompanying the plans and specifications. This presurvey consisted of borings made every 50 to 100 feet throughout the entire route of the tunnel.

In the short time that the Central Contracting Company had to examine for itself the character of formation to be encountered in constructing the tunnel, it verified appellant's presurvey by making soundings in each boring, and in each instance encountered rock formation; so it concluded, as appellant had done, that the excavations of the tunnel would be through solid rock. This was all the examination of the formation to be encountered it could have made in the length of time it was allowed before making its bid, which time did not exceed two days from the time it was given the specifications and the plat which recorded appellant's presurvey. Appellant believed the correctness of its presurvey, for it accepted the bid for the cheaper gunite construction, which could only be used if the tunnel was excavated through solid rock, and the Central Contracting Company believed the correctness of the result of the resurvey because it both verified such survey and entered into the contract for gunite construction.

It is true that, in the specifications, there appears this clause, under the head of "Information for Bidders": "The quantities given below, though estimated with as much accuracy as possible in advance, are to be considered as approximate only. Bidders must satisfy themselves from personal examination of the proposed work, and of the detailed plans, or by such other means as they may prefer, as to the accuracy of the following estimate, and must not, after the proposals are submitted, dispute or complain of such estimate, or assert there was any misunderstanding in regard to the nature or amount of the work to be done" (here follows itemized statement of the estimated excavations to be made).

Likewise, under the same heading appears this clause: "All parties who shall bid on any portion of the work called for in these specifications nor shown on the accompanying plans must familiarize themselves therewith, and they shall also personally examine the route of the proposed sewer noting the conditions to be met with during construction."

When these clauses contained in the specifications, above copied, are read in connection with the estimated quantities of excavations itemized following the first clause, it becomes clear that they are not sufficient to remove the element of mutual mistake in this contract. The motion for rehearing is overruled.

Overruled.

BOND, Justice (dissenting).

I am unable to agree with my associates on the questions decided in the majority opinion, and must give effect to the contract as made by the city of Dallas and the Central Contracting Company, from which the rights of appellee must be determined. There is no contention that there exists any further covenants or agreements.

Preliminary to the making of the contract, the city of Dallas surveyed the route and planned the tunnel at a place it thought best. It made superficial test holes, only a few inches deep, with a hand auger, to locate the upper outline of rock through a hill, and, on such survey and tests, formulated the plans and specifications. Bidders were requested to furnish two bids; one on the basis of concrete placed in the tunnel by the ordinary method of being poured behind forms set in place, and an alternative bid for "gunite" lining.

The plans and specifications and the call for bids provide: "The quantities given below, though estimated with as much accuracy as possible in advance, are to be considered as approximate only. Bidders must satisfy themselves from personal examination of the proposed work, and of the detail plans, or by such other means as they may prefer, as to the accuracy of the following estimate, and must not, after the proposals are submitted, dispute or complain of such estimate, nor assert there was any misunderstanding in regard to the nature or amount of the work to be done." The plans and specifications further provide: "All parties who shall bid on any portion of the work called for in these specifications or shown on the accompanying plans must familiarize themselves therewith, and they shall also personally examine the route of proposed sewer noting the conditions to be met with during construction." Before entering bids on the construction, a Mr. George Prendergast, agent of the Central Contracting Company, and Thomas H. Shortall, the appellee, went over the proposed route, examined the depth of the superficial test hole, and determined for themselves the upper outline of the rock formation. With this information, the Central Contracting Company submitted its bid; $45,014.82 on "gunite" construction, and $49,029.82 on heavier concrete. The bid of the Central Contracting Company for the gunite method was accepted, and, thereafter, on March 18, 1930, a contract was entered into in which the contractor undertook, covenanted, and agreed to fur-nish all labor and material, a completed structure, in accordance with the true purpose and design of the sewer, in accordance with the proposals of the said contractor.

The contract, as noted in the majority opinion, is quite lengthy. Only five of its provisions, I think, are pertinent to the questions involved on this appeal, which I deem it advisable to quote in full:

"Section 7—The contractor shall not be entitled to any claim for damage from any hindrance or delay from any cause whatever in the progress of the work, or any portion thereof; but when such hindrance or delay results from any cause entirely beyond the control of the contractor, such hindrance or delay (excepting such as may from time to time result from ordinary and not unusual weather conditions for the season of the year when said contractor is at work), may entitle the said contractor to such an extension of time for completing the contract as may be determined by the City acting by and through its Board of Commissioners providing the contractor shall have given notice in writing to the Board of Commissioners of the cause of the delay."

"Section 12—The City Engineer shall have the right to make alterations in the line, grade, plan, form or quantity of the work herein contemplated either before or at any time after the commencement of the work. If such alterations diminish the quantities of the work to be done they shall not constitute a claim for damages or for anticipated profits on the work dispensed with. If they increase the amount of work such increase shall be paid for according to the quantity actually done and according to the price or prices stipulated for such work or similar work in this contract."

"Section 14—That the said contractor hereby agrees that it will not transfer, sublet or assign this contract by power of attorney or otherwise, or sublet any part of the work except for delivery of materials, to any other person, firm, or corporation or in any way abridge the terms of this contract and the specifications, without first obtaining the consent of the City of Dallas, expressed by a resolution of the Board of Commissioners, and upon such conditions as may be prescribed by the said Board of Commissioners; not shall the said contractor, assign, by power of attorney or otherwise, any of the moneys payable or arising under this contract without first obtaining the consent of the Board of

Commissioners and under such terms and stipulations as the City shall make."

"Section 26—That it is further mutually understood between the parties that the said contractor, before filing his bid or proposal upon the said work herein contracted for as well as before signing this contract, has by careful examination satisfied himself as to the nature and location of the work, the conformation of the ground, the character, quality and quantity of materials to be encountered and to be used and the character of equipment and facilities needed preliminary to and during the work under this contract. The said contractor fully realizing all of said conditions agrees to deliver the entire work herein contracted for in accordance with the plans, profiles, drawings and specifications prepared by the Engineer and adopted by the Board of Commissioners, and according to the true purpose, intent and design of the same, and to do and perform all work necessary to accomplish the same."

"Section 28—That it is further mutually understood that as shown by the bid of the contractor and the tabulation of the same as shown by the report of the said Engineer the said contractor agrees to perform the work herein contracted for according to the above schedule of prices and to do and perform the same for the sum of Forty Five Thousand and Fourteen and 82/100 ($45,014.82) which said sum shall represent the full compensation to be paid the contractor, provided, however, that should the quantities of the said work be diminished or increased or should the said contractor be required to perform any extra work the same shall be paid for, or in the case of diminished quantities the same shall be subtracted from said contract price according to the methods prescribed by the terms of this contract, provided, further, however, that no extra claim shall be allowed for any real or asserted work unless the same shall have been approved by the Engineer and the Committee in charge of the said work and duly certified to the Mayor and Board of Commissioners."

On March 22, 1930, four days after the date of the contract, the Central Contracting Company, in violation of section 14, above quoted, and without the knowledge or consent of the authorities of the city of Dallas, entered into an agreement with Thomas H. Shortall, whereby it assigned, sublet, and transferred the work contracted, and Shortall assumed all of the obligation of the contract; and, soon thereafter, moved his machinery to the site of the tunnel, placed drag lines and concrete mixers at the north and south portals in preparation for the commencement of the work. A delay was encountered at the south portal, due to the fact that the city of Dallas had not acquired right of way across property owned by Mr. Sam Leake, who obtained a temporary injunction against the city, on the ground that he had not been adequately compensated under a condemnation proceeding instituted against him by the city.

The Central Contracting Company, on April 18, 1930, was notified by the city authorities to commence work, and, on May 12, 1930, when the right of way was cleared and the injunction dissolved, the contracting company was again notified to begin work from the south portal of the tunnel, through the Leake property. Shortall then commenced active work of construction, under the active supervision of the Central Contracting Company; such supervision being exerted by George Prendergast and H. H. Meers, both employees and representatives of the Central Contracting Company.

The delay occasioned by the Leake injunction, from April 18, 1930, to May 12, 1930 (23 days), is the basis for the item of $2,677.36 damage, which the trial court and the majority opinion hold the city is liable to the appellee Shortall.

Soon after the commencement of construction, it was found that the north and south portals of the tunnel could not be located at the point first anticipated, due to the lack of hardness and consistency of the rock formation; so it became necessary to move the openings or portals further into the side of the hill, which required a greater amount of open cut. The city of Dallas agreed with the Central Contracting Company that the north and south openings to the tunnel might be moved, and, for the extra work necessary in moving, the city of Dallas paid the contracting company on monthly estimates, furnished by it, for the amount of the open excavation upon the unit of a cubic yard, as bid by the contracting company; and then a shaft was sunk from a higher point up the hill to the grade line of the tunnel. From this shaft, tunneling operations were carried outward to the portal or openings. The spoils, consisting of loose rock, were hoisted up the shaft, then trucked from the top of the shaft to a final point of disposition.

After the tunnel had been partially completed, it was determined by the city au-

thorities that the gunite method of applying concrete would be unsuitable to the needs of the city of Dallas, and a change was made for re-enforce concrete, using the plan of construction called for under the bid of the Central Contracting Company for such work.

On April 24, 1930, the engineer of the city of Dallas received and, on August 6, 1930, forwarded the respective letters copied in the majority opinion. The one received was addressed to "Mr. John Young, City Engineer," and signed by "Central Contracting Company, by G. Edward Prendergast"; and the one forwarded was addressed to "Central Contracting Company, attention Mr. G. Edward Prendergast." It will be noted here that, in neither of these letters is mentioned appellee Shortall as having a claim against the latter, or was in any way interested in the construction of the tunnel as a subcontractor or assignee. The record reflects that all monthly estimates were signed by the Central Contracting Company, approved in its name, and all vouchers therefor were issued to the Central Contracting Company, indorsed and either cashed or deposited in a bank to the credit of the Central Contracting Company. It will be further noted that not a single voucher was ever issued to Shortall or cashed by him during the construction of the tunnel.

The city of Dallas, under the contract, paid the Central Contracting Company for the heavier type of concrete, re-enforcing and timbers, left in place, and for rock excavation and refilling same with concrete, in the sum of $66,165.36, on monthly estimates adjusted and accepted by the Central Contracting Company.

The sinking of the shaft 70 feet in depth to the grade line of the tunnel is the basis for the item of $2,236.79; the haul of the soil and spoil from the shaft to its final point of destination is the basis for the item $1,139.10, and the disposition of excavated material, because of the unanticipated formation encountered, is the basis for the item of $18,947.50. These three items, with the item of $2,677.36, above mentioned, for delay, and $4,803.21 interest thereon, aggregating the sum of $29,803.96, is the amount the trial court and the majority opinion holds the city is liable to the appellee Shortall. To the holding, I am unable to agree.

I am of the opinion that Shortall, being a stranger to the contract, was under no obligation to the city to perform its covenants, voluntarily assuming to do so under private arrangements with the Central Contracting Company, and could impose no liability upon the city by virtue of his voluntary undertaking; nor could he assume that the city had the right to construct the tunnel on the Leake property, which occasioned his alleged damage for delay. Clearly, the appellee Shortall had no right to assume and rely upon the fact that the city of Dallas had performed a duty to the Central Contracting Company of having secured the right of way before the work of construction would be directed to begin. The city made no contract with Shortall, and there is no evidence that, at the time Shortall moved the machinery and retained his skilled employees, for which he predicates his damage for the delay item of $2,677.36, the city knew the Central Contracting Company had assigned the work to him. The Central Contracting Company assembled no machinery, nor is there any claim that it had skilled employees to cause it damage. So, if Shortall, under private arrangements with the Central Contracting Company, incurred that expense, it was of no concern of the city, and the liability of the city therefor would not attach. It is not contended that the city gave consent for the assignment or subletting of the contract, or that any employee knew at the time of the delay the contractor had done so. Then, how could the city be estopped, if, in fact, a municipality may be estopped in the circumstances?

The governing authority of the city of Dallas exists in a board of commissioners; the board, acting within the scope of its authority, alone can bind the municipality in constructual contracts and the expenditures of public funds. The contract involved in this suit (section 14), in effect, allows the contractor the right to transfer, sublet, or assign the work, only by obtaining the consent of the city of Dallas, expressed by a resolution of the board of commissioners and upon such conditions as may be prescribed by the board. This provision is, without doubt, valid. Its saliency is evident in this controversy. It may well be presumed that the board knew the extent of the city's liability under the contract for any delay it might occasion to the Central Contracting Company, and, furthermore, it knew to whom liability would extend. The contractor's assignee,

one or many, in the absence of a valid agreement authorizing the assignment, clearly has no cause of action against the city of Dallas for damages growing out of delay in getting the work started, for which it cannot be presumed that the city knew of such efforts on his part.

On the three items relating to unforeseen conditions, the contract clearly exempts the city of liability. I am in strict accord with the rule announced in the majority opinion, which the appellee, in argument before this court, admits is applicable to the facts of this case, and, to stress the point, I quote from the opinion: "If there had been no pre-survey made by appellant, showing the character of formation, and bids, at least impliedly requested to be made on such survey, then appellant's contention that the formation actually encountered would be matters entirely incident to the cost of construction, and such costs appellee would have to bear. Under such condition, if the Central Contracting Company based its bid on the belief that there was a solid rock formation, through which the tunnel could be constructed, it would be the contractor's mistake, uninfluenced by any representations of appellant as to the character of formation. The rule of law contended for by appellant, under the facts we have stated, is the necessary result of giving effect to the contract, as made. And again, if appellant had represented to bidders that the character of formation shown on its map must not be relied on as a true character of formation, but that each bidder must satisfy himself of the character of formation to be encountered, or some similar expression, then appellee would have no cause of action for either of these three items of damages."

What are the facts? (1) The plans and specifications and notice for his bids, as quoted in this opinion, specifically provide that the quantities shown on the plans were estimated and to be considered as approximate only; that bidders were required to satisfy themselves from personal examination of the proposed work of the detailed plans and the accuracy thereof, and familiarize themselves therewith; and "must not, after the proposals are submitted, dispute or complain of such estimate, nor assert there was any misunderstanding in regard to the nature or amount of work to be done, and shall also personally examine the route of the proposed tunnel,

noting the conditions to be met with during construction"; (2) Mr. Prendergast, representative of the Central Contracting Company, and Mr. Shortall, the appellee, went over the route of the proposed tunnel, inserted a rod in the hole depth made by the city, and thereafter, the Central Contracting Company submitted its bid, which was accepted, and the contract for the construction of the canal was entered into. The contract, as noted above, in effect recites: (a) The contractor to furnish all labor and material; (b) to deliver a complete structure, in accordance with the intent and design of the structure; (c) that it had inspected the site, and was thoroughly familiar with local conditions, and that it would not complain of them; and (d) to bear all loss arising from action of elements and "from any unforeseen obstruction of the work."

The troubles encountered by the contractor in the excavation of the tunnel, the sinking of the shaft and the removal of the spoils arose from a local condition, and unforeseen circumstances in the prosecution of the work. These burdens and hazards were expressly assumed by the contractor, and to guard against such unforeseen conditions, the city of Dallas protected herself under the related provisions of the contract.

In the case of Hill v. City of Beaumont (Tex. Civ. App.) 5 S.W.(2d) 590, involving a situation very similar to the one here, a written contract for the construction on the city's wharves provided that bidders should inspect the site and inform themselves of local conditions, and that all losses arising from unforeseen circumstances, or unusual obstructions or difficulties, should be borne by the contractor. The court held that the contractor was not entitled to recover against the city, because of encountering large number of logs imbedded, notwithstanding the city's blueprints and plans did not disclose obstructions, the city had contracted to forestall any liability for such unforeseen obstructions. It is without controversy that the Central Contracting Company agreed with the city of Dallas to furnish all of the material, tools, and labor necessary to construct a complete sewer through the hill "in accordance with the true purpose and design of the said profiles, plans, drawings and specifications." Assuming, without deciding, that the appellee Shorthall stands in the shoes of the contractor, he

therefore took over the obligations with reference to construction, and can stand in no better position than his assignor. Shortall then undertook to perform the obligation of the contractor, but, after entering upon the work, finds the obligations more onerous than was expected, due to the fact that the formation through which tunneling operations were expected to be carried were not as anticipated, he should not be heard to say that he was disappointed with conditions actually facing him in carrying out the contract, or that the plans and specifications were faulty. Lonergan v. San Antonio Loan & Trust Co., 101 Tex. 63, 104 S.W. 1061, 106 S.W. 876, 22 L. R. A. (N.S.) 364, 130 Am. St. Rep. 803; Dearing & Sons v. Texas Construction Co., (Tex. Com. App.) 1·S.W.(2d) 265. If the plans and specifications of the city were insufficient, yet the contractor, having agreed to deliver a completed tunnel to the city, that it would not complain of local conditions, and would bear all loss arising "from any unforeseen obstruction of the work," cannot be heard to complain. To relieve the contractor or its assignee of the responsibilty which they voluntarily assumed would require the courts to make a new contract for the parties. To my mind, the contract should stand with its benefits and burdens, as the parties themselves have made it, therefore, respectfully. indicate my dissent; the judgment should be reversed and here rendered for the appellant.