POMEROY P. DICKINSON et al., Appellants, *v.* THE CITY OF POUGHKEEPSIE, Respondent.

Under the provisions of the act of 1867 (§ 6, sub. 2, chap. 333, Laws of 1867), relative to providing for a supply of water in the city of Poughkeepsie, the water commissioners appointed by the act had only power, in case they determined to let out the whole or a portion of the work of building a reservoir by contract, to contract in the manner prescribed, *i. e.,* "to the lowest bidder who shall give due security" upon public notice of proposals; any other contract is wholly unauthorized and void.

Where proposals were advertised for and received by said commissioners, and one of the competitors was permitted by the engineer, to whom the proposals were referred for calculation and comparison, to alter his bid so as to make it appear lower than that of the others, and then, after acceptance of this bid, a contract was made at higher prices, with a large number of prices stipulated for therein not in the competition at all, and with a material clause inserted to the benefit of the contractor, in no manner contemplated by or offered to the other bidders. *Held,* that the contract was unauthorized and void; that, being so void when executed, its execution did not confer upon the contractor any right of action thereunder, and that no recovery could be had upon a *quantum meruit.*

The contract provided a fixed price for "earth" excavation. *Held,* that this included "hard-pan;" that to limit or vary the ordinary, gen-

eral meaning of the word by proof of usage, if it could be done (as to which, *quære*), it devolved upon plaintiff to show a usage uniform, general and presumably known to the parties, not a usage local, partial or personal.

To prove a valid usage or custom, it is not essential that all the witnesses should agree; if they differ as to its existence in the same places or in all places, this presents a question for a jury; but, where the witnesses upon one side show the existence of the custom in some localities and as to some contracts, and those of the other side that no such custom exists in other localities or as to other contracts, the proof fails to establish a custom uniform and universal.

(Argued June 21, 1878; decided November 12, 1878.)

APPEAL from judgment of the General Term of the Supreme Court, in the second judicial department, affirming a judgment in favor of defendant, entered upon an order dismissing plaintiffs' complaint, on trial. (Reported below, 7 Hun, 1.)

This action was brought to recover for work alleged to have been done by plaintiffs upon the employment of the water commissioners of the city of Poughkeepsie, under authority of the act, chapter 333, Laws of 1867, and the various acts amendatory thereof.

The facts appear sufficiently in the opinion.

*H. A. Nelson*, for appellants. It was proper to prove by parol that "earth excavation," "rock excavation," and "hard-pan excavation," as used in the contract, referred to and meant separate and distinctive materials. (2 Hun, 615; 1 Greenl. Ev., §§ 292, 295; *Dana* v. *Fiedler*, 12 N. Y., 40; 50 id., 76, 79; *Johnson* v. *De Peyster*, id., 666.) Even if the writing signed by the parties as a contract for the construction of the reservoir was void, the proposal by plaintiff, and the acceptance by the water commissioners constituted a valid contract for the performance of such construction. (*Garfield* v. *U. S.*, 93 U. S. [3 Otto], 242, 243–246; *Bonestiel* v. *Mayor, etc.*, 22 N. Y., 162; *Hoag* v. *Lawrence*, 60 id., 101.)

*O. D. M. Baker*, for respondent. Plaintiffs in removing the hard pan merely did what the contract required, and

they were not entitled to any extra compensation therefor. (*Riley* v. *City of B'klyn*, 46 N. Y., 444; *Nesbitt* v. *L. C. and C. R. R. Co.*, 2 Spears, 697; *Sherman* v. *Mayor, etc.*, 1 N. Y., 316; 1 Dil. on Munic. Corp., § 375.) Proof of custom and usage was inadmissible to vary and enlarge the terms of the contract. (*Simmons* v. *Law*, 3 Keyes, 219; *Mut. Ins. Co.* v. *Hone*, 2 N. Y., 244; *Barnard* v. *Kellogg*, 10 Wall., 383; *Bradley* v. *Wheeler*, 44 N. Y., 500; *Walls* v. *Bailey*, 49 id., 464; *Hill* v. *Hib. Ins. Co.*, 10 Hun, 29; 2 Parsons, 535; *Dawson* v. *Kettle*, 4 Hill, 107; *Sipperly* v. *Stewart*, 50 Barb., 68.) Defendant could only be bound by a contract entered into in the manner prescribed by the statute, and the *onus* was on plaintiffs to show that this was done. (Laws 1867, chap. 333, § 6, sub. 2, p. 743; *Appleby* v. *Mayor, etc.*, 15 How. Pr., 428; *Moore* v. *Mayor, etc.*, 4 Hun, 545; *Nash* v. *St. Paul*, 8 Minn., 174; *In re Eager*, 46 N. Y., 100.) The water commissioners were not authorized to enter into and execute the contract with plaintiffs, and it was void as to defendant. (*Bonestiel* v. *Mayor, etc.*, 22 N. Y., 162; *Dickinson* v. *Poughkeepsie*, 7 Hun, 1; *Nash* v. *St. Paul*, 11 Minn., 174; *Swift* v. *City of Williamsburgh*, 24 Barb., 427; *Donovan* v. *Mayor*, 33 N. Y., 291; *Tenth Nat. Bk.* v. *Mayor*, 4 Hun, 429; 1 Dil. on Munic. Corp., § 372; *Hodges* v. *City of Buffalo*, 2 Den., 110.) If the contract required plaintiffs to remove the hard-pan at forty-five cents per yard, a subsequent agreement to allow additional compensation for the same work was gratuitous, without consideration and void. (*Colcock* v. *Louisville R.*, 1 Strob., 329; *Delafield* v. *State of Illinois*, 2 Hill, 174; *Boon* v. *City of Utica*, 2 Barb., 104; *Suprs.* v. *Bates*, 17 N. Y., 242; 2 Greenl. Ev., 58; Dunlap's Paley, 256; 1 Redf. on Railways, 413, 427; 2 Eng. L. & E., 35.) Plaintiffs failing to establish a cause of action under the contract were not entitled to recover upon a *quantum meruit*. (*Cowen* v. *City of Troy*, 43 Barb., 48; *McSpedon* v. *Mayor, etc.*, 7 Bos., 601; *Bonestiel* v. *Mayor, etc.*, 22 N. Y., 162; *McDonald* v. *Mayor, etc.*, 68 id., 23.) The estimates and payments under

the contracts were final as an accord, and satisfaction of the claims asserted.    (12 Jur. N. S., 500.)

HAND, J.   The section of the statute, conferring the powers material to be considered by us upon the water commissioners of the city of Poughkeepsie, is not entirely free from ambiguity.   It authorizes them, among other things, to build reservoirs, etc., employ engineers, laborers, and all other help, and do all acts that may be needed to take waters and introduce them into the city, " *or* they may put the whole or any part of the same out on one or more contracts, first giving at least two weeks' public notice of proposals in all the city newspapers, and such contract or contracts shall be given to the lowest bidder, who shall give due security for the performance of the same." (Laws of 1867, chap. 333, § 6, subd. 2.)    But this language although hardly precise, is tolerably plain in its meaning. It gives to the commissioners power to build the reservoir by their own engineers, themselves employing the laborers and purchasing the materials ; or they may let out the whole or portions of the work by contract.   In case they do the latter, they must issue proposals and receive bids, on two weeks' notice in all the city papers, and must award the contract to the lowest bidder.

In case, therefore, they elect to put a reservoir under contract, their powers with reference to such contracts are sharply defined.   Their entire authority to let out the work on contract is conferred by the statute, and that statute prescribes how and how only they can make a contract ; it must be upon public notice, be open to competition upon proposals, and must be made with the lowest bidder appearing upon such competition.   Any other contract is wholly unauthorized, beyond their powers, and therefore void.   (*In re Eager*, 46 N. Y., 100; Dillon on Mun. Corp., § 388, and cases cited.)

Under this statute, the water commissioners elected to " put out " the College Hill reservoir on contract.   Sealed proposals were invited by public notice, according to the

statute, and it was stated in the notice that the form of proposal, drawing and contract, in conformity to which the work would be done, were to be seen, up to the day of opening the bids, at the commissioners' office. A form of contract and specifications was adopted by the commissioners and exhibited to the bidders, in accordance with the notice. This form of contract only required to be filled in with names, dates, and prices, to be a complete contract. A notice to contractors was also furnished, showing an approximate estimate of quantites, by which it was stated that the bids were to be canvassed, to determine who was the lowest bidder; but it contained classifications not mentioned in the proposals. Three bids were put in for the work; one by the plaintiffs, one by Nelson, and the third by Ward & Lary. Nelson and Ward & Lary were not residents of the city of Poughkeepsie. These bids were presumably put in on or before the thirtieth day of September, the day fixed by the notice; and it appears by the minutes of the board of water commissioners that they were all opened on the fourth of October and referred to their engineer, Rand, for calculation and comparison. It is said by the plaintiffs that Nelson's bid was rejected for informality in not naming sureties, and in some other respects, but no formal rejection appears upon the minutes of the commissioners. The bid was referred to the engineer for "comparison," and its aggregate was reported back by the engineer as the highest of the three. Indeed the informality referred to also existed in the plaintiffs' bid, as well as other more important departures from the form.

    It is established beyond question, in the evidence, that after the reference of the bids to the engineer Rand, a series of interviews were had between him and the plaintiff Dickinson, and the plaintiffs' bid was between them altered in several respects. The engineer finally reported to the commissioners the result of his canvass of the three bids, by which he made it to appear that the plaintiffs were the lowest bidders, Nelson the highest, and Ward & Lary intermediate. These results were produced by varying all the bids. Ficti-

tious prices were added to the bids actually put in by Nelson and Ward & Lary for items not included in the form of proposals furnished them, and, in some instances, the prices actually bid by them were raised. The prices actually bid by the plaintiffs were lowered; in one instance, the bid of $1.25 per yard for puddle being cut down to twenty-five cents per yard, bringing it below Nelson's bid of thirty cents. This single item made the bid of the plaintiffs appear in the canvass nearly $10,000 less than it really was, and less than was inserted in his contract, finally signed and now sued upon. Added to their canvass, it alone would have made them considerably higher than Nelson's canvass, falsely swelled as it was, and higher than Ward & Lary's canvass, as made, though not higher than it would have been if the prices bid by the last for puddle had not been, for some reason, omitted therefrom. The alterations actually made, at these interviews, in the plaintiffs' bid are claimed, by the plaintiffs, to have been, in the aggregate, to the advantage of the city; and by the defendants, to have been to the advantage of the plaintiffs. This is not perhaps very important, in the view we take of the case, but it is clear that some of these changes were to the advantage of the plaintiffs, and some of them had the result of giving them prices for classes of work not offered to the other bidders or made the subject of competition at all. The defendant confidently claims, and I think the evidence establishes, that upon a fair canvass of the bids, as actually put in and opened by the board, the plaintiffs were not the lowest bidders.

After these canvasses, which it must be conceded were false and illusory, had been presented by the engineer to the board of commissioners and obtained from them on the fourteenth of October an award of the contract to the plaintiffs of all the work of building the reservoir, with certain exceptions, a contract was drawn up by the engineer. To this was attached another proposal of the plaintiffs, which is dated October fourteenth, the first one being dated Septem-

ber thirtieth. This proposal appears to differ from the original, even after its alteration, in many respects, in some cases raising the prices bid. Whether it was submitted before the award or not, or at all, I am not able to ascertain from the evidence. The contract, as drawn by the engineer, varied from the award, in including the work expressly excluded by it. It also varied, in material particulars, from the form of contract submitted to the bidders, adding classifications of work not competed for or included in the proposals or form of contract, and prices for which it appears had been arranged verbally between the engineer and the plaintiffs, after the bids were opened ; and including, among other things, the price of puddle "material to be furnished by contractor," at $1.25 a yard, although this had been presented to the board at twenty-five cents a yard, presumably to get below Nelson's actual bid. It gave twenty-five cents a yard for "making puddle," which clearly under the contract as competed for was to be done without other compensation than the payment for earth excavation and embankment, and for which the other bidders would have had nothing. It contained at the end an entirely new clause, not found in the form or proposals, a clause upon which the plaintiffs' present claim is founded, and which, if they are right in its interpretation, added very largely to the contract price of the work, as bid for by all the competitors, and really withdrew the most expensive item of the reservoir construction entirely from competition and any risk on the part of the contractor. This clause was headed S. and provided that "for any work not herein classified or defined as to price, and which said contractors may be directed by said engineer, in writing, to do, the said contractors shall receive, and they hereby agree to receive, as full compensation for said work, the actual cost of the work, with fifteen per cent added."

This clause was inserted by the engineer, as the plaintiffs claim, after the opening of the bids, as a consideration of their lowering their bid for earth excavation from sixty to forty-five cents, the same as in Nelson's bid ; although the

defendants give strong proof from the papers themselves to show that the bid, as opened, was forty-seven cents, and was subsequently raised to sixty cents in the negotiation with the engineer. The plaintiffs say the purpose of clau-e S. was to protect them, on their lowering their bid to forty-five cents, against *hard-pan*, which they apprehended would be met with, and the engineer thought would not, and that under it they are entitled to about $1.50 a yard, and fifteen per cent, in addition, for 23,000 yards of hard-pan, which if competed for at all under the proposals, was bid for as earth excavation, but which this clause withdrew from that classification.

The plaintiffs insist that these transactions, subsequent to the opening of the bids, at least as to the change in the plaintiffs' original prices, were known to the commissioners, that they were made with a view of lowering the cost of the work, and that the contract when drawn was fully read to the board. I do not think the evidence establishes that the most objectionable parts of these transactions were known to the commissioners or that they had anything more than the general idea that the engineer was securing a reduction of prices from the original bid; or that the change in the form of the contract was fully understood by them. This is not, however, material to the view hereafter taken of their effect upon the validity of this contract. It is also strenuously insisted by the plaintiffs that no intentional fraud or fraudulent practices in procuring the contract, on their part, are proved. It is difficult to reconcile some of the facts established with innocent intent, or to perceive how they could have had any other object than to benefit improperly the plaintiffs; but here again, the validity of the contract does not depend upon this question.

It is impossible to conclude otherwise than that the commissioners, in entering into this contract, did so either consciously or unconsciously in direct violation of the statute. The facts which have been detailed show conclusively that the contract was not let to the lowest bidder, or " put out " to be com-

peted for, in the manner directed and required by the act. It would entirely destroy all healthy competition and frustrate all the advantages derivable from receiving proposals upon public advertisement, if one of the competitors could be permitted, after the bids were opened, to alter his own bid to suit the case, so as to make it appear just below the others, and to have it presented as lower than it really was, even after alteration, for the purpose of getting the contract; and then make a contract at the higher prices, with a large number of prices, stipulated for therein, not in the competition at all; above all, to have a clause inserted for his advantage, in no manner contemplated by the other bidders, or offered to them. Such a contract is by no means *the* contract offered to the lowest bidder by advertisement (see *Nash* v. *St. Paul*, 11 Minn., 174), and whether less or more advantageous, is probably equally beyond the powers of the commissioners. It is not intended to hold that when a contract has been awarded to the lowest bidder in fact, he may not consent to lower his prices even below his bid, and, in the absence of any other material changes, the contract still be valid; but it would vitiate the whole system of competitive bidding and lead to the grossest abuse, collusion and overreaching of municipalities and others in like situation, if a favored competitor might, after all the bids were opened, all perhaps too high, and his the highest among them, secure the contract by altering his own bid to range just below the lowest of his rivals. That indeed was not all that was done here, for the proof shows much less innocent and more mischievous dealings: and the board was probably actually deceived as to who was the lowest bidder, even after the alterations, and a contract was drawn departing widely from the proposals.

The statute absolutely requiring all contracts for the whole or any part of this reservoir to be made with the lowest bidder, after public notice and receiving proposals, and the commissioners having no power to contract otherwise, it follows from what has been said that this contract is in excess of their powers, illegal and void.

Being void when executory, its execution does not confer upon the plaintiffs any right of action thereunder. There is no ratification of a void contract, for the commissioners had no power to contract, either *by ratification* or otherwise, except with the lowest bidder, upon advertisement. A promise to pay cannot be implied, where there is no power to contract. (*Burrill* v. *Boston*, 2 Clifford, 590; Dillon on Mun. Corp., § 383.)

Nothing could be more futile than the prohibition of the *making* of a contract except with the lowest bidder, if the contract having been made in direct violation of this prohibition, it could be rendered valid merely by being persisted in by both parties, contrary to public policy and the law. If the execution of a contract, the making of which is prohibited, as against public policy, absolutely cures its invalidity, a mere continuance in violation of law would have certainly a strange result. It is difficult to see what use or force there could be in such prohibitions, so general as to municipalities and so much a part of our policy in this State, if the consummation of their violation brings with it the protection of the law and a right of action for payment upon the void contract. The contrary we understand to be settled by adjudication. (*Hodges* v. *Buffalo*, 2 Den., 110; *Brady* v. *New York*, 20 N. Y., 312; *Halstead* v. *New York*, 3 Comst., 430; *McDonald* v. *New York*, 68 N. Y., 23; *Cowen* v. *West Troy*, 43 Barb., 48; Dillon on Mun. Corp., § 383.)

This principle may sometimes work hardly; but it is better, says the United States Supreme Court, "that an individual should occasionally suffer from the mistakes of public officers or agents, than to adopt a rule which, through improper combinations or collusion, might be turned to the detriment or injury of the public:" *Whiteside* v. *United States* (93 U. S. R., 247, 257). See also *Hawkins* v. *United States* (96 id., 691).

Our conclusion is that the plaintiffs made out no cause of action under clause S. of the written contract, as that clause

was void, whether the hard-pan excavation was covered by the bid for earth or not.

It remains to consider whether any right of action was established by the plaintiffs for any further compensation, upon a *quantum meruit*, either from the fact of doing this work for which they have been paid in full, as earth excavation, and its being used by the defendant; or from the conversation had between them and some of the commissioners, as to all being made right after the hard-pan was struck.

With regard to the first ground of recovery upon a *quantum meruit* the point seems to be settled adversely to the plaintiffs by authority. The cases generally hold that there can be no recovery against a municipality for services performed upon a contract void for want of power to make it, although performed upon the property of the municipality, and of which they have the benefit. As was said in *Burrill* v. *Boston* (2 Clifford, *supra*), there can be no implied promise to pay upon a *quantum meruit*, where there is no power to contract, either expressly or impliedly, except upon a written contract with the lowest bidder after advertisement. (See *Bonesteel* v. *New York*, 22 N. Y., 162; *Brady* v. *New York*, *supra*; *Hodges* v. *Buffalo*, *supra*; *McDonald* v. *New York*, *supra*.)

With regard to the second ground, it is not necessary now to consider whether, at the time of the conversation, the commissioners had the power to employ the plaintiffs to excavate the hard-pan without a written contract. No proof was given that they attempted to do so. They always estimated it and paid for it as covered by the contract. No resolution was ever passed on the subject, but some of them are shown to have said that if the plaintiffs were to go on and the hard-pan did not come under the contract, what was equitable would be done. This hardly amounts to an independent employment, irrespective of the written contract, in any view.

But I think it is clear, leaving out of view, for the moment, the evidence of usage, and looking at the contract

alone and the ordinary meaning of the language used therein, that the hard-pan was all included in the earth excavation, in which case, of course, it is not pretended that anything was promised by the commissioners, or that the plaintiffs have any claim against the defendant.

It cannot be denied that the material excavated was shown to be, in a general sense, earth, although more or less compressed and cemented ; and to be precisely the same material as earth, namely : Clay, gravel, loam, etc. Webster defines " earth " to be soil of all kinds, including gravel, clay, loam, and the like, in distinction from the firm rock ; and under the word "pan" he defines" hard-pan" as " a hard stratum of earth." It never had been and is not claimed to be properly described as rock ; and it was shown by the plaintiffs' witnesses to be frequently expressly described in contracts for excavation as earth, and included in that term. In the absence of proof of any settled technical custom or practice in the use of terms, the plaintiffs seemed to concede that the word earth covered it, as they claim that their original bid of forty-seven or sixty cents a yard (whichever it was) for earth excavation was made under the apprehension that hard-pan was to be removed as a part of the job of clearing the defined water space of the reservoir of all material, and that it would properly be classed under earth excavation, and they consented to reduce their bid to forty-five cents, on the mistaken opinion of the engineer that it would not be found. The contract provided that the work to be done consisted in making the requisite excavation of material from the water space described, and the prices specified for earth and rock excavation were agreed to be received in full compensation for the labor in removing material, and executing all the\ work contemplated in the contract, and for all losses arising out of the nature of the same, or from any unforeseen obstruction or difficulties. It seems therefore beyond question that the contract taken and construed together, and without extrinsic aids, did not exclude from, but included the hard-pan in the classification of earth excavation.

To give a different interpretation to the meaning of the contract, and to limit the ordinary general meaning of the word " earth " by technical usage, the plaintiffs introduced the evidence of various experts, who swore that, in their experience, hard-pan had not been classified as earth, unless expressly so stated. The defendant, on the other hand, produced experts of very large experience, who testified that such technical limitation of the meaning of the word earth was not known to them, but that their usage was to conform to the general scientific and popular meaning, and classify hard-pan as earth.

The burden being upon the plaintiffs to vary and limit the meaning of the writing by usage, — assuming this could be done at all — which is doubtful, (*Aymar* v. *Astor*, 6 Cow., 266; *Vail* v. *Rice*, 1 Seld., 155; *Dawson* v. *Kittle*, 4 Hill, 107; *Wheeler* v. *Newbould*, 16 N. Y., 392), they must show a usage uniform, general, presumably known to the parties, and not local, partial, or personal. (*Bradley* v. *Wheeler*, 44 N. Y., 495; *Higgins* v. *Moore*, 34 id., 417; *Barnard* v. *Kellogg*, 10 Wall., 383; *Boardman* v. *Gaillard*, 60 N. Y., 614.) This, in my opinion, they failed to do; and a jury were not authorized, from the whole evidence, to find such uniform binding custom. It is not, of course, intended to hold that to prove a valid custom, all the witnesses sworn on both sides must agree about it. They may differ as to its existence in the same place or in all places, and this would raise a question for the jury; but here is no such conflict. The plaintiffs' witnesses prove that .they followed and knew of such custom, as to some localities and contracts; and the defendants show that there was no such custom in other localities and as to other contracts, no witness assuming to say that the custom was universal. The result of this evidence was not therefore a conflict as to a uniform custom, but a demonstration that the custom was local and partial.

. The result is that there was no sufficient proof to vary the meaning of the contract, and that the excavation was

included in the terms of the contract.  This disposes of any claim for payment, arising on the alleged promise by some of the commissioners.

The case shows clearly that the plaintiffs, in receiving but forty-five cents a yard, have not been adequately paid for the cost of this excavation.  We feel this hardship, but do not see how their claim can be sustained upon any legal principle.  Our regret at the result is lessened by the consideration that according to the indications of the evidence the plaintiffs have been probably paid, in the aggregate, nearly all that the work was fairly worth, as a whole, and that the so-called contract was obtained by methods which cannot be defended.

The judgment must be affirmed, with costs.

All concur.

Judgment affirmed.