DAVIS et al. v. COMMISSIONERS OF SEWERAGE OF CITY OF LOUISVILLE, KY., et al.

. No. 598.

District Court, W. D. Kentucky.
Feb. 20, 1936.

Bruce & Bullitt, of Louisville, Ky., for plaintiffs.

Rowan Hardin and William T. Baskett, both of Louisville, Ky., for defendants.

HAMILTON, District Judge.

This suit was brought by the plaintiffs to recover additional compensation for services rendered under a contract which they had with the defendants, commissioners of sewerage of the city of Louisville, for the construction of a combined storm and sanitary monolithic, concrete sewer, designated Highland Park-Beechmont sewer in the city of Louisville, approximately 8,555 linear feet, located on Southern parkway south of Woodland avenue and extending along the parkway to Wellington avenue, thence eastwardly with it to First street; thence northernly to Wentworth avenue; thence eastwardly with Wentworth and Hiawatha avenues to Louisville avenue; one branch thereof thence northernly with this avenue to Ottawa street and another branch southernly along Louisville avenue to Pocahontas avenue.

The plaintiffs are citizens of the state of Oklahoma, and the defendant, commissioners of sewerage of the city of Louisville, is a quasi corporation created under the laws of the commonwealth of Kentucky. Its sole business is the construction, maintenance, and operation of a system of sewerage in the city of Louisville. The other defendant is a city of the first class under the laws of the commonwealth of Kentucky. More than $3,000, exclusive of interest and costs, is involved in this action, the requisite diversity of citizenship exists, and the court has jurisdiction of the subject-matter.

The court appointed a special master to hear proof, make findings of fact, conclusions of law, and a report thereof, with the right reserved to review all the findings and conclusions of the master.

The case is now pending before me on ten exceptions to the master's report, findings of fact and conclusions of law. The exceptions are so drawn as to require a review by the court of all the evidence in the case, and I have done so.

The plaintiffs are partners, and, before the letting of the contract involved in this action, had a number of years' experience in public contracting, all of which involved excavating materials and the construction of stone and concrete masonry in sewers, drains, reservoirs, and highways. Neither of them had done any work in Louisville, Ky., previous to the execution of the contract involved in this action, and they were not familiar with subsoil conditions in the vicinity where the sewer was constructed.

The defendant, the sewer commission, had built many miles of sewers in the city and its vicinity. The work carried on by it included all types of sewer construction. In letting bids and making contracts, it used a printed form bound in one cover containing information for bidders, form of proposal, bidders' bond contract, bond and specifications for the construction of sew-

ers. Parts of the form were stricken out, interlineations made and blanks filled to meet the conditions under which the commission desired to construct a particular sewer project. It also prepared detailed plans, specifications, and blueprints of its contemplated work for its own use and convenience and that of bidders in preparing and executing contracts. It also made borings to determine subsoil conditions and the location of the sewer line before asking for proposals or entering into contracts for construction, and this information was made available to prospective contractors before lettings.

On July 1, 1928, the commission advertised in trade papers and otherwise, that it would, on July 20, 1928, receive at its office in Louisville, Ky., bids or proposals for the construction of the sewer heretofore outlined. It stated in its advertisement that it would receive bids for the following work:

"Statement of approximate amounts of work embraced in this contract:

| | | | | |
|---|---|---|---|---|
| 2,872 lin. ft. — 12'–2" | x 7'–9" | Rectangular Reinf. Concrete Sewer | | |
| 1,415 "    " — 11'–3" | x 7'–9" | " | " | " | " |
| 2,681 "    " — 8'–9¼" | x 8'–0" | Basket Handle " | " | " |
| 2,503 "    " — 4'–4" | x 6'–6" | Inverted Egg " | " | " |

— Outlet Structure, Regulator, Diversion and Junction Chambers, Manholes, Stubs, etc.

"In the above work there will be approximately the following quantities:

9,470 lin. ft. — Earth Excavation in open trench
14,410 cu.yds. — Class A Concrete
2,098,000 pounds — Reinforcing Steel
— Minor Items not listed.

"Payment for earth excavation will be by the linear foot and cubic yard, concrete by the cubic yard and steel by the pound."

On request, it furnished to bidders information as to the form of proposal. In this information, each bidder was advised that he would make his bid on the blank form prepared by the commission. It was also stated that locations and results of borings or soundings made near the line of the sewer were shown on the drawings. Samples obtained from the borings had been marked for identification and were on display in the commission's office for examination by prospective bidders. It also stated that these samples approximately represented the material obtained from the borings, but the commission did not guarantee their true character or that they were approximately correct.

All reference to rock excavation was stricken out of the proposal and contract. There was left therein "earth excavation and backfill." Earth was defined "the word earth, when used in these specifications, shall mean all kinds of materials, including old masonry excavated or which are to be excavated." There was stricken out of this paragraph "except rock, as hereinafter defined."

In information furnished the bidders, it was stated that the quantities set out to be removed and used were stated with as much accuracy as was practical in advance, but that they were only approximations, and that it was the duty of the bidders to satisfy themselves by personal examination of the location of the proposed work and by such other means as they preferred as to the actual conditions and requirements of the work and the accuracy of the estimates of the engineer. It was stated that, after the submission of the estimate, no dispute or complaint could be asserted by the contractor of any misunderstanding in regard to the nature of the work. It was also stated that after the bid was submitted, no claim could be filed by the contractor based on the fact that the plans were impractical under conditions encountered in the work or insufficient, or that there was any lack of information or data.

The plaintiffs made a proposal to the sewer commission on the form provided by it. They agreed to make earth excavation and backfill on a linear foot basis, depending on the size of the sewer at $15, $12, $10, and $6 per linear foot, and for earth excavation and backfill for outlet structures $1.50 per cubic yard, and for earth excavation below the sewer drain, or underdrain, $1.50 per cubic yard.

Their proposal was accepted and a contract entered into on August 24, 1928, in accordance with the plans, specifications, and drawings. They agreed to complete the work within 270 days, excluding Sundays and legal holidays. Additional time was to be allowed if delay was caused by

acts of God, of the government, strikes directly affecting the work, extreme cold weather, floods in the Ohio river, or extra work ordered near the completion of the job.

The plaintiffs commenced construction on the date provided in the contract and had no difficulty so far as subsoil conditions were concerned until May 10, 1929, at which time they struck a hard material which required wedging, sledging, or blasting to remove, and a great deal of it was encountered during the balance of the work. Shortly after striking difficult subsoil conditions, the plaintiffs complained to the defendant commission and asked for extra compensation on account thereof, insisting they did not expect such conditions when they entered into the contract.

The work was finally completed and accepted by the commission and immediately thereafter the plaintiffs presented a claim to the defendants for $233,218.25, all of which was disallowed. Thereupon the plaintiffs filed a statement of a lien for labor and materials against the defendants as provided under the laws of the commonwealth of Kentucky, and thereafter instituted this action.

It was claimed in the petition that the defendants committed a fraud, either actual or constructive, on the plaintiffs by representing to them that there would be no quantities or items of rock excavation or backfill involved in the construction of the sewer, and that this was accomplished by deleting from the proposal, information to bidders, and contract the word "rock" wherever it appeared therein, and that the word "earth" as used was a representation by the defendants to the plaintiffs that no substance requiring wedging, sledging, or blasting would be encountered in making the excavation.

It was also alleged that the borings were not made as represented by the defendants and the samples thereof were not properly labeled; that the use of the word "shale" in naming the samples misled the plaintiffs into believing that the substance to be encountered was of such material as could be removed without wedging, sledging, or blasting.

It was also alleged that the plaintiffs knew nothing about the geological formation or the nature of materials underlying the surface of the earth around Louisville and where the sewer was to be erected, and that the plaintiffs did not have sufficient time to make an investigation to ascertain these facts from the date of the advertisement for bids to the letting. It was further alleged that they acquainted the defendant, the sewer commission, with these facts, and it sent with the representatives of the plaintiffs its engineer to make a personal inspection of the proposed route of the sewer, and that the engineer instructed them not to quote any price on the excavation of rock; that no such material would be encountered in the construction of the sewer.

It was further alleged that the proposed route of the sewer was through used paved public streets of the city, and that it was impossible, because of traffic conditions, for the plaintiffs to make tests on their own account of subsoil conditions before bidding. In making their proposal, they relied exclusively on the information furnished to them by the sewer commission. They alleged that they made their proposal and entered into the contract without making any bid for rock excavation or backfill, under the belief that no such material was to be excavated, and that they acted solely on the information furnished them by the defendant, the sewer commission, as to subsoil conditions.

It was then alleged that about May 15, 1929, at or near station 30/00, they encountered rock at an elevation of about six inches above subgrade and continued to encounter large quantities of rock and slate which could not be excavated without blasting; that this material varied in thickness above subgrade of the sewer from a few inches to $11\frac{3}{4}$ feet, and existed over approximately half of the project. They alleged they excavated more than 3,120 cubic yards of limestone and more than 4,352 cubic yards of hard flinty slate, all of which was located in the lower portions of the sewer and underdrain and several feet below the surface, and by reason thereof excavation was costly and difficult.

It was then alleged that limestone and slate were found above the bottom of alleged borings shown on the plans and specifications, and that these borings did not indicate there were any such substances to be encountered in the excavation.

It was then alleged that the plaintiffs made their proposal and entered into the contract under the mistaken belief that no such hard material would be encountered in the construction of the sewer and that they had been deceived and misled by the representations of the defendant, the sewer

commission, and that it knew the character of the material that would have to be excavated and withheld such information from the plaintiffs. It was further alleged that if these facts were not true the commission was misled in believing that only gravel, shale, and loose stone would be encountered in excavating for said sewer, and that a mutual mistake had been made by the parties which was caused by the negligence and carelessness of the defendant, the sewer commission, in making borings or soundings and in selecting samples of materials from the borings. The plaintiffs then alleged that on ascertaining the kind of material that would have to be excavated in the performance of the work, they immediately notified the sewer commission's engineer of the condition and requested the chairman of the commission to call a meeting thereof for the purpose of changing the contract to take care of the increased cost of the excavation, and the chairman advised them a meeting could not be held at that time because of the absence of members, but if they would continue the performance of the contract, a fair settlement would be made on account of the delay of the work and the extra cost and expense caused by the excavation of the hard material.

It was then alleged that it was impractical to discontinue the contract and rescind it because the work had progressed to a point where great loss and damage would be sustained in the abandonment thereof. Relying upon the assurances of the chairman of the commission that a fair settlement would be made with them at the completion or during the progress of the work, they, at great additional cost and expense, purchased or rented the necessary machinery and equipment and employed the necessary extra labor to excavate and remove the hard substances, and completed said contract.

They alleged that pursuant to a resolution of the defendant, the sewer commission, at the completion of the work, they presented a claim to it for $204,484.85, the fair and reasonable cost over and above the price set out in the contract as compensation for the construction of the sewer project in materials actually existing and not covered by the contract. They also claimed $2,634.40 for 658.6 cubic yards of gravel at $4 per cubic yard, which was used to fill voids arising from blasting, which would not have been necessary if only loose material or dirt had been excavated. They also claimed that the defendant, the sewer commission, illegally deducted, under Article 16 of the contract, $5,150 liquidated damages for failure to complete the contract within the time provided, when in fact said delay was caused by encountering rock and slate and no liquidated damages were due.

They also claimed $2,586.79 in addition to $3,172.60 which had been paid them for the construction of the sewer underdrain which they had agreed to construct free of charge in the contract upon the mistaken belief of the parties that it could be built in subsoil materials similar to the samples of the borings or soundings, when in fact they were compelled to construct it after excavating rock or slate.

The defendants answered, denied all material allegations of the petition, and pleaded affirmatively that various provisions of the proposal and contract prevented the plaintiffs from asserting any claim against the defendants for extra work, notwithstanding they had found subsoil conditions not contemplated by them at the time their proposal was made and the contract entered into.

The master found against the plaintiffs, holding that the alterations in the printed form contract did not exclude rock excavation, and that the plaintiffs were not misled by any representations of the commission as to subsoil conditions. He further held that no duty rested on the defendant, the sewer commission, to make borings or to give the plaintiffs any information, and that the commission had substantially furnished to the plaintiffs all the information it had. He further held that the word "shale" was a correct designation of the material obtained by borings and was not misleading. He also held that no duty rested on the commission to suggest to the plaintiffs the kind of materials they would actually encounter in making the excavation, and that no additional responsibility rested on the commission on account of the plaintiffs being unfamiliar with subsoil conditions in the vicinity of Louisville, Ky. He further held that the alleged memorandum sent by mail to the plaintiffs in regard to subsoil conditions could not be construed to change the uniform specifications submitted to all bidders, and that the alleged conversation that plaintiffs' representative had with the chairman of the commission did not operate to change the con-

tract between the parties or to impose any additional obligations on it. He also held that the commission was without power, and there was no consideration for any promise, to pay the plaintiffs additional compensation for work which was required under the original contract. He further held that letting of contracts by a public body, such as the commission, is confined exclusively to the terms of the proposal, and the specifications in connection therewith, formally submitted to all bidders, and no changes can be made therein by oral representations or agreements. He also held that the defendant was under no duty to furnish to bidders speculative conclusions from the facts known to it, and that the commission owed no duty with reference to conditions unexpected by the plaintiffs and unknown to the defendant as a matter of fact, unless there was a contractual warranty in reference thereto. He further held that the commission was responsible for affirmative representations made to bidders, and was under a duty to disclose to them all information in its possession affecting the contract, and that it could not contract against this liability. He also held that the commission was liable only in the event there was a misstatement or suppression regarding matters actually known to it, or as to matters affirmatively stated in the proposal or specifications, and found from the facts that the commission had not violated its duty in any way.

■ The construction of sewers and drains is a public governmental function, but in making contracts therefor the city acts in a proprietary and not a governmental capacity, and such contracts are governed by the same rules as control individuals.

■■ A municipality in entering into contracts and inviting bids for sewer construction is not bound to make a prophecy of what is underground for the benefit of the contractor, nor is it required to anticipate abnormal conditions and assume all the risk of the venture. The rule by which parties to a written contract are bound by its terms, and which holds that they cannot be heard to vary by parol its expressed and unambiguous stipulations, or impair the obligations which the contract engenders by reference to the negotiations which preceded the making of the contract, or by urging that the pecuniary results which the contract has produced have not come up to the

expectations of one or both of the parties, fully applies to these contracts.

■■ It is a well-settled rule of law that if one makes an absolute and unqualified contract to perform certain work, he must comply with his agreement at all hazards. The corollary to this rule is that where one party to a contract knows that the other relies on him disclosing fully all facts material to the execution thereof, a duty rests on such person to not conceal anything material to the bargain, and if there is concealment resulting in damage to one, the other causing it must assume the entire responsibility.

■ A construction contractor is required to exercise ordinary care before entering into a contract to ascertain all conditions that will confront him in the execution of the project, and he is chargeable with all matters discoverable by the exercise of such care no matter what his loss may be. If he misunderstands or fails to correctly interpret facts furnished to him, the fault is his, and no one else can be held liable. In measuring the relative responsibilities of the parties, it is the duty of the court to give weight to the opportunities each has to discover and know the facts. Where one is unfamiliar with subsoil conditions in a community, and this fact is known to the other party, a higher duty rests on the one possessing the knowledge to exercise ordinary care to furnish full and complete information to the other, when he knows the other is acting, or is about to act, on his knowledge of such conditions.

In the case at bar, the sewer commission had for a long time engaged in the construction of sewers and had full and complete knowledge of subsoil conditions. The plaintiffs had no knowledge of such conditions, and this was known to the commission. As nearly accurate information as is obtainable of all material conditions in advance of contract letting is of advantage to both the contractor and the commission. The nearer certainty is approached, the greater the probability the cost of the project may be fairly determined, and by reason thereof bidders are more likely to do the work at a fair cost. If the contractor is required to guess, in most instances he will bid so as to avoid loss and resolve all doubts against the city.

The plaintiffs first received notice of the proposed letting at St. Joseph, Mo., twenty days before bids were to be received.

Their witnesses testified that before entering into the contract the plaintiffs, by letter, requested the commission to furnish them facts concerning subsoil conditions and what might be encountered in the excavation; and that Mr. Caye, technical engineer, in reply, stated that soil conditions were specifically as shown on the plans. This is denied by Mr. Caye, and the letters were not introduced in evidence, the proof showing they had been lost. I have not found any facts on this question, because I believe it unnecessary in my decision to determine whether or not such representation was made.

A representative of the plaintiffs came to Louisville fourteen days before the letting and went over the plans and sewer location, and together with a representative of the commission inspected places in the vicinity where sewers were being built in open trench. Three days before the letting, A. A. Davis, one of the plaintiffs, and his representative who had made the first inspection, came to Louisville and advised the commission that they had no knowledge of subsoil conditions in the vicinity, and in order that they might ascertain them wished to see the territory through which the sewer was to be built, and to be told anything else the commission knew about them. The commission sent its representative to go over the ground with the plaintiffs. They took with them the plans, specifications, and form of proposal for the sewer, and also inspected places where other sewers were being built in open trench in the vicinity of the contemplated construction. The plaintiffs claim that the engineer for the commission stated to them, while going over the site, that they would encounter no rock requiring blasting, in making the excavation, and they need not bid on the idea that such substance would be encountered. This fact is denied by the engineer, and in the findings of fact I have not so found, but the evidence shows that the purpose of the visit was to ascertain subsoil conditions, and there was no information furnished to the plaintiffs at that time that hard substances would be found in executing the contract, although the commission knew that blasting would be required.

At the places visited, where open trench work was going on, subsoil conditions were such as to require only the use of a steam shovel in removing the material. The commission had on display in its offices profiles, specifications, and blueprints showing the location of the sewer and the type and kind of construction. It also had samples of borings and indicated on the plans and specifications their exact location. The only material of any substantial hardness shown by samples or on the plans was labeled "shale." The letting was to be on a linear foot basis, and bids were invited for earth excavation and backfill. No mention was made of rock.

The plaintiffs commenced work on the sewer promptly under the contract, and consumed 204 of the 270 days without penalties, before any troublesome underground conditions developed. In the latter part of the work, they were compelled to excavate 3,120 cubic yards of limestone and 4,352 cubic yards of hard shale, which required blasting, wedging, and sledging, and for removing this material they claim extra compensation.

The plaintiffs complain of two major matters entitling them to relief: (1) That they were deceived by the commission striking out all reference to rock in the proposal, contract, and bid and leaving therein the phrase "earth excavation," which they construed to mean material that could be removed without wedging, sledging, or blasting; and (2) the withholding of information by the commission of subsoil conditions, and by misrepresentations as to the borings.

Taking these matters up in the order stated, the defendant prepared and used in all of its sewer lettings a form book, so arranged that changes could be quickly made by interlineation or elimination to meet the type of work proposed. On a linear foot basis, the form of contract here in question provided for payment for each foot across the trench. There was deleted from the form all matters providing for a letting on a cubic yard basis, which measures payment by each yard of material excavated, and also deleted a lump-sum basis which provided for payment for all excavation regardless of width or length.

The contract was said by the defendant to be "unclassified" in contradistinction to a "classified" bid, although it is not positively identified as either. It is claimed by the defendant that the interlineations and eliminations of the language in the contract were made necessary because the bid was unclassified, and that was the sole purpose of the changes.

It is well to remember in considering this case that the contract and all forms pertaining thereto were prepared by the defendant, and in case of doubt in the construction of any language in any of the papers it is my duty to bear heavily against it. Many phrases used in the material papers relieve the defendants of all responsibility for mistakes, errors, or representations. Such a method will not be permitted to avoid the liability for decisive statements of fact or for withholding significant facts. In construing public contracts as private contracts, the intention of the parties must be determined and the letter of the instrument must yield to the spirit of the occasion, and fair dealing.

The term "earth excavation" used in a construction contract does not ordinarily mean rock or hard materials, but only includes clay, gravel, loam, and the like, as distinguished from firm rock. Dickinson v. City of Poughkeepsie, 75 N.Y. 65, 71; Nesbitt v. Louisville, C. & C. R. Co., 2 Speers (S.C.) 697, 705; Shephard v. St. Charles Western Plankroad Co., 28 Mo. 373, 377; Blair v. Corby, 37 Mo. 313, 317; Sweeney v. Jackson County, 93 Or. 96, 178 P. 365, 376, 182 P. 380.

The defendant, while admitting this general rule, claims that the definition of earth in section 1.1, page 95 of the specifications, gives a special meaning to the term, modifying the accepted definition. As originally written in the specifications, rock was excepted. With rock eliminated, the definition reads, "The word 'earth,' when used in these Specifications, shall mean all kinds of materials, including old masonry, excavated or which are to be excavated." It would have been very easy to add to "masonry" the word "rock," so as to avoid all ambiguity. "Materials" is a word of diversified use, and its sense in this contract is any substance or matter of which anything is made or may be made; to form from matter. It, of course, includes rock, but it is not free from ambiguity when considered in connection with the meaning of earth excavation in construction contracts.

The plaintiffs undoubtedly believed it did not include rock. They bid "for earth excavation and backfill for outlet structure, diversion and regulator chambers, etc., below Station 1/12.03 the sum of $1.50 per cubic yard." (Item 1g, page 25 of proposal.) This was a fair price for excavating loose material, but below the customary charge for excavating rock or hard substances.

It can hardly be said that the elimination of all references to rock in the proposal, contract, and specifications was imperative because the letting was on a linear foot basis. A different price for earth and rock could have been provided for as easily on such a basis as on a cubic yard basis; but the plaintiffs should have known that the word "materials" includes rock. The contract, as finally concluded, did cover rock, but the ambiguous language used may be taken into consideration in determining whether or not the defendants were misled into believing no hard substance requiring blasting would be encountered.

Taking up the second ground of complaint, the evidence shows that the commission made, with a sand auger, 21 borings or soundings contiguous and in some instances close to the sewer line, and in every instance bored to sewer subgrade unless substances so hard as to stop the auger were encountered. This instrument would not penetrate substantially hard material. When the sewer trench was opened, hard shale and limestone were found in an undulating line through about one-half of the distance. The substance encountered was at a higher elevation than was shown opposite borings No. 8, 9, 10, 11, 12, and 15. These borings were not made directly in the sewer line, but nearby, which is in all likelihood the reason for the discrepancy. However, the commission in planning the sewer and the plaintiffs in making their proposal assumed that these borings did fairly represent the subsoil condition of the trench. The plaintiffs were justified in assuming that they were fairly accurate. Borings No. 5, 6, 7, 8, 13, 14, 16, 17, and 18 were opposite dips in the hard shale or rock, and while no hard substance was encountered immediately opposite them, it was found slightly to the right or left thereof.

In classifying the samples of borings, the defendant labelled the hard substance encountered by the auger as "shale." The plaintiffs claim the substance found on excavation was slate and not shale, and that by reason of this there was a willful misbranding. The proof, however, shows that the substance encountered was in fact shale, and that there is no slate in the vicinity of Louisville, Ky.

Even though the substance was not slate, it may have been misleading nevertheless. The word "shale," without further qualification, would not be clearly indicative of whether the substance was hard or

soft. The defendant used blank forms for making field notes of borings, and on this form its agents wrote the words "shale rock," but in labeling the samples the word "rock" was dropped and "shale" alone was used.

The composite definition of shale, as found in the dictionaries, is as follows: "A shale or flake or loose stone from a mine or quarry; a rock formed by the consolidation of clay, mud, or silt, having finely stratified (a bed of earth or rock) or laminated structure (divided into thin plates). Shales present almost endless varieties of texture and composition, passing on the one hand into clays, or, where much indurated, into slates and argillaceous (clay) schists (any rock that splits into slates or slabs) on the other into flagstones or sandstones; or again, through calcerous (containing lime) gradation into limestones, or through ferruginous (containing or impregnated with, iron, rust colored) varieties into clay iron stones, and through bituminous (containing mineral pitch) kinds into coal."

A person familiar with subsoil conditions in the vicinity of Louisville would probably conclude that in excavating shale he would likely encounter a substance that would require blasting, wedging, or sledging to remove it, but one not so familiar would probably conclude that it was a substance that could be easily removed with a pick and shovel or a steam shovel.

The directing engineers of the commission were thoroughly familiar with the substances that would probably be found in excavating the trench, and they knew that wedging, sledging, and blasting would be required. In fact, the technical engineer for the commission testified that the material found on excavation was just about what he thought would be encountered at the time the plans and specifications for the project were drawn. He also testified that the fair price for excavating shale at the time the contract was let was approximately $4.10 per cubic yard. He knew the plaintiffs bid $1.50 per cubic yard for excavating earth, which was greatly under the price for excavating shale. The only information he, or any one else acting for the commission, gave to the plaintiffs was that the substance was shale.

Some of the samples of the borings were as hard as that found on excavation, but these were small fragments and hardly sufficient to put the plaintiffs on notice when taken into consideration with other facts in the case. The specifications, blueprints and profiles did not put the plaintiffs on notice as to the character of material underground, and the open trenches inspected by the plaintiffs together with the engineers for the commission disclosed no hard substances, so that all of the facts furnished to the plaintiffs before the letting, to say the least, had a tendency to lull them into the belief that no wedging, sledging, or blasting would be required in making the excavation.

Undoubtedly the commission's knowledge of subsoil conditions was superior to that of the plaintiffs, and they tried to acquire this knowledge from it. It is equally true that these facts were not within the fair reasonable reach of the plaintiffs, and there was lack of time for them to obtain this information by an independent investigation before the letting. Under such conditions, a legal obligation rested on the defendant commission to disclose to the plaintiffs all the information it had as to the subsoil conditions. 'It would seem to be a fair rule of conduct to require each party in every case to communicate to the other, if requested, his knowledge of material facts, provided he knows the other to be ignorant of them, and they are not open and naked or equally within the reach of the other party's observation, or unless they are open to common observation, or apparent on inspection, or if they are such as are discoverable at first view or visible to the eye. Stewart v. Wyoming Ranch Co., 128 U.S. 383, 390, 9 S.Ct. 101, 32 L.Ed. 439; Hays v. Meyers, 139 Ky. 440, 107 S.W. 287, 17 L.R.A.(N.S.) 284, 139 Am.St.Rep. 493.

The duty rested on the sewer commission to furnish to the plaintiffs in this case all the material information it had in its possession, obtained either by borings or from past experience, as to subsoil conditions in the sewer line, and if it failed to do so, and as a result thereof the plaintiffs were put to large additional expense in completing the contract, they are entitled to recover the reasonable damages sustained by them. I believe the facts are amply sufficient to support a recovery for the additional cost the plaintiffs expended in excavating the hard material. This conclusion is supported by the following cases: Christie v. United States, 237 U.S. 234, 250, 35 S.Ct. 565, 59 L.Ed. 933; United States v. Utah, N. & C. Stage Co., 199 U. S. 414, 425, 26 S.Ct. 69, 50 L.Ed. 251;

Hollerbach v. United States, 233 U.S. 165, 172, 34 S.Ct. 553, 58 L.Ed. 898; Simpson v. United States, 172 U.S. 372, 383, 19 S. Ct. 212, 43 L.Ed. 482; United States v. Spearin, 248 U.S. 132, 139, 39 S.Ct. 59, 63 L.Ed. 166; United States v. Atlantic Dredging Co., 253 U.S. 1, 12, 40 S.Ct. 423, 64 L. Ed. 735; United States v. L. P. & J. A. Smith, 256 U.S. 11, 17, 41 S.Ct. 413, 65 L.Ed. 808; United States v. Gibbons, 109 U.S. 200, 205, 3 S.Ct. 117, 27 L.Ed. 906; Passaic Valley Sewerage Commissioners v. Holbrook, Cabot & Rollins Corporation (C.C.A.) 6 F. (2d) 721, 725; City of Lima, Ohio, v. Farley (C.C.A.) 7 F.(2d) 40, 42; Pitt Construction Co. v. City of Alliance, Ohio (C. C.A.) 12 F.(2d) 28, 32; John King Co. v. Louisville & N. R. Co., 131 Ky. 46, 114 S.W. 308; Highland Motor Transfer Co. v. Heyburn Building Co., 237 Ky. 337, 35 S. W.(2d) 521; McGovern v. City of New York, 202 App.Div. 317, 195 N.Y.S. 925; Maney v. City of Oklahoma, 150 Okl. 77, 300 P. 642, 76 A.L.R. 258, 278 (note).

When the plaintiffs discovered hard substances would be encountered in excavating the trench line, which would increase the cost of the work, they immediately notified the chairman of the commission that they would expect pay therefor. The work had then progressed to a stage where it was not for the best interests of either party to rescind the contract. Because of the absence of all members of the commission except the chairman, no meeting could be held, and the plaintiffs continued the work. Their claim for additional compensation was not rejected by the commission until after the work had been completed. The chairman of the commission, at the time of the taking of proof in this case, was in such physical and mental condition as to make him incapable of testifying, and no other member of the commission testified or was offered as a witness. The testimony of the plaintiffs as to the promises made them by the commission stands uncontradicted, and while not sufficient to support a promise to pay for the extra work by the defendant, they are sufficient to relieve the plaintiffs of the burden of having voluntarily performed work not called for by the contract, or having performed work without the consent or permission of the commission.

■ The matter of allowing additional compensation for work done under construction contracts with a municipality should be restricted in its application, otherwise it might be made the source of great abuse. While such an action theoretically seeks to recover damages for a breach of contract, its real purpose is to secure compensation for extra work; and a municipal representative and a contractor might by collusion make the theory a ready method of saddling a municipality with extra work and materials which it never authorized, and of burdening it with liabilities which it never contemplated. A municipality should not be subjected to any unlimited risk of this kind, but where the evidence is clear that a contractor is required, at additional cost, to do work not covered by the contract, and this result is brought about by the fault of the municipality, the courts should not hesitate to allow the contractor additional compensation for the loss he would otherwise sustain if not reimbursed for his outlay.

The hard shale and limestone rocks which the plaintiffs were required to excavate in the construction of the sewer were not specifically covered by the original contract. They did not voluntarily remove these materials without first notifying the defendant that they expected additional compensation. The question of whether or not it was covered by the contract was fairly debatable, and its determination was surrounded by doubt. There was probably no way the matter could be conclusively determined without an impartial investigation by a disinterested tribunal.

■ The recovery for the increased cost should be upon a quantum meruit basis. There are no applicable contract provisions fixing the rate or price. Much proof has been introduced in the record as to what is a fair price. The plaintiffs claim that the additional cost was $204,484.85, being determined by an itemization of the actual cost of doing the work. The measure of damages, however, is not what was actually expended, but what was the reasonable cost; and the proof on this basis is very conflicting.

The master made no findings as to cost, because he concluded the plaintiffs were not entitled to anything.

Eight witnesses testified for the plaintiffs, including the two members of the firm and their associate, a construction contractor doing business in the city of Louisville, who had been engaged in sewer work, and four contractors and engineers of St. Louis, Mo., who knew nothing personally about

subsoil conditions or prices for work in the vicinity of Louisville. The two plaintiffs and their associate placed the cost at $25 per cubic yard, without adding contractor's profit, and further testified that 15 to 20 per cent. should be added for profit. The Louisville contractor fixed a rate of $10 for trench limestone, $20 to $25 for underdrain limestone, $7.50 for trench hard shale, and $20 to $25 for underdrain hard shale. The engineers and contractors, expert witnesses, from St. Louis, refused to fix a cubic yard cost, but testified to a gross sum. One said a reasonable additional cost would be $130,000, another $125,000, another $115,990, and the other $106,000.

Six witnesses testified for the defendant. Two of them were its engineers, one an engineer employed by the city of Louisville, and the remaining three were Louisville contractors, all doing business with the commission. One of the commission's engineers estimated the cost at $4.10 per cubic yard for hard shale and $8.05 for limestone; the other at $4.39 for hard shale and $8.77 for limestone. The city engineer fixed $5.20 per cubic yard for hard shale and $8.20 for limestone. One contractor fixed a cost of $3 for hard shale, $7 for limestone; another $4 for hard shale and $8 for limestone; and the other, $6.48 for both.

I have concluded that the fair and reasonable cost of excavating, in sewer trench and underdrain, hard shale over soft shale or dirt, prevailing in the city of Louisville during the calendar years 1928 and 1929, on the project here involved, including additional cost of backfilling and removing material in the construction of the sewer, and adding thereto 15 per cent. contractor's profit, would be $7 per cubic yard for hard shale and $12 per cubic yard for limestone.

There is due the plaintiffs additional compensation for removing, excavating, and backfilling, for limestone $39,115.20, and for removing hard shale, $30,845.01, making a total of $69,960.21.

The defendants charged the plaintiffs $5,150 liquidated damages, at the rate of $25 per calendar day, for 206 days' delay in completing the contract. They seek to recover this sum, claiming that all of the delay was due to encountering rock and hard shale. This fact is disputed by the defendants, and the evidence on the subject is conflicting. It is admitted that 204 days were consumed before any rock was struck,

and before the sewer was half completed. It is clear from the evidence that not all of the delay was due to striking the hard substance. I have concluded from the evidence that 100 days was due to the excavation of hard shale and rock. The plaintiffs are, therefore, entitled to recover, on this account, from the defendants, $2,500.

The plaintiffs also claim that they were compelled to use 658.6 cubic yards of gravel in filling voids caused by blasting. The evidence shows that where blasting is required it is impossible to excavate exactly to the trench line, which can be done where only dirt or soft material is removed. The evidence satisfactorily shows that approximately the number of yards of gravel claimed was used because of the blasting. The reasonable cost of the gravel and placing it is in dispute. The witnesses testified that a reasonable price was from $2.50 to $4 per cubic yard. The plaintiffs' bid price for using gravel under the contract was $4 per cubic yard. Weighing all the evidence, I believe this sum should be allowed on this item, and there is due the plaintiffs, on that account, $2,634.40.

The plaintiffs, in their proposal, inadvertently failed to submit a bid on item 12 of the work, to furnish and lay 1,000 feet of six-inch, and 1,000 feet of eight-inch underdrain. On July 23, 1928, they agreed that if the contract was awarded to them, they would lay this underdrain without additional payment. After beginning the contract, the commission's engineer required the plaintiffs to furnish and lay 5,753 linear feet of six-inch underdrain and 692 linear feet of eight-inch underdrain, in addition to the 1,000 linear feet of six-inch and 1,000 feet of eight-inch underdrain, and paid them $3,172.60 for the additional feet. The fair and reasonable price for this item is 87 cents per linear foot for six-inch underdrain in place, and $1.09 per linear foot for eight-inch underdrain. On this basis they are entitled to recover $2,586.79 in addition to the sum already paid.

The plaintiffs claim 6 per cent. interest from May 10, 1930, on all items of additional compensation. The sums owing for excavating rock and hard shale were uncertain and unascertainable by computation at the time of the commencement of this action. The price, therefore, was in dispute, and also the amount excavated. They are not entitled to interest on this item, except from the date of the entry of judgment. Stephens v. Phœnix Bridge Co.

684

(C.C.A.) 139 F. 248, 250. They will be allowed interest at the rate of 6 per cent. on the other items from May 10, 1930, until paid.

The exceptions to the master's report will be sustained, and a judgment entered for the plaintiffs in accordance with the findings of fact and conclusions of law filed in this action.